PUHL and others, Plaintiffs, v. MILWAUKEE AUTOMOBILE INSURANCE COMPANY and others, Defendants. [Appeal and cross appeals.] *

*October 7—November 3, 1959.*

* Motion for rehearing denied, with $25 costs, on January 5, 1960.

344.

345

For the plaintiffs there was a brief and oral argument by *N. Paley Phillips,* attorney, and *Bertram J. Hoffman* of counsel, both of Milwaukee.

For the defendants there were briefs by *McCue & Regan,* attorneys, and *D. J. Regan* of counsel, all of Milwaukee, and oral argument by *D. J. Regan.*

HALLOWS, J. Joseph Fetzer and his insurer contend the trial court erred in refusing to hold that Fetzer as a matter of law was not causally negligent as to management and control and lookout. Fetzer contends that he did all he could to avoid the collision.

There was credible evidence to sustain the jury finding that Fetzer was causally negligent as to lookout and management and control. Fetzer was driving south on Highway

175 at 35 miles an hour. His wife was sitting next to him and the other plaintiff sat in the rear seat of the car. Anna Fetzer first saw the Myles car as it was entering Highway 175 from the east, or left. At that time the Fetzer car was about 100 feet from the north edge of Highway 167. She called to her husband. Up to that time he had made no effort to stop his car. When she called to her husband, the car seemed to jerk forward and then Fetzer applied the brakes. The Fetzer car skidded 51 feet and hit the car driven by Myles. Fetzer testified he knew he was on an arterial and people would have to stop, so he did not have to pay too much attention to his driving. He knew there was a filling station on the northeast corner of the intersection that obstructed the view of cars coming from the east. When his wife yelled, Fetzer glanced up and saw the Myles car. He may have momentarily stepped on the gas but he did not recall it. When Fetzer braked his car the Myles car was in the intersection in front of him. Fetzer testified that if he had applied his brakes at the time his wife yelled he could have stopped in approximately 100 feet and prior to the collision.

At the time of the impact the front of the Myles car was four to five feet over the west edge of Highway 167. When Fetzer first saw Myles, the Myles car was a few feet east of the east edge of the intersection. From the time Fetzer first saw the Myles car to the time of the impact he did not blow his horn or attempt to turn to the right or the left. Fetzer testified that if he had been looking prior to the time his wife yelled he would have seen the Myles car sooner.

Myles was driving west on Highway 167. The stop sign for Highway 175 is located about 132 feet east of the center of the intersection. Myles made a complete stop at the stop sign and then proceeded to the east edge of Highway 175. He could not see what was coming on the highway because of the filling station, did not make a complete stop at the

intersection, but continued across it. He could not remember what his speed was, but his car was in second gear when struck.

The jury could properly conclude that if Fetzer had been looking and had been more attentive to the road he would have seen the Myles car sooner than he did. Because Myles was negligent in entering the intersection does not necessarily mean Fetzer was not negligent. The operator of an automobile having the right of way on an arterial highway must still maintain a proper lookout. Having the right of way does not relieve one of the duty of watching the road for vehicles on the highway or entering thereon. *Oelke v. Earle* (1956), 271 Wis. 479, 74 N. W. (2d) 336, and *Whyte v. Lindblom* (1934), 216 Wis. 21, 255 N. W. 265, 256 N. W. 244.

Fetzer's failure to put on his brakes as soon as he saw the Myles car indicates negligence as to management and control. If he had applied his brakes when he first saw the Myles car he could have stopped before the collision. The jury could conclude that Fetzer delayed in applying his brakes or became startled when his wife yelled at him and momentarily stepped on the accelerator instead of the brake. Fetzer did nothing to avoid the accident except to apply his brakes too late.

Anna Fetzer contends that the trial court erred in not allowing certain medical and hospital expenses. The hospital and two doctor bills for the first year after the accident were paid out of money received by Joseph and Anna Fetzer under the medical-pay provisions of the policy of the defendant insurance company. Another hospital bill was paid after the first year out of insurance funds. There was no proof of any agreement by Anna Fetzer in her individual capacity with the hospitals and doctors to render the services, to pay therefor, or to assume payment thereof. A married woman may contract for medical services in her

own right but in the absence of an express contract between her and the person rendering the service, her husband is liable for such expenses. *Jewell v. Schmidt* (1957), 1 Wis. (2d) 241, 83 N. W. (2d) 487. This doctrine was qualified in an emergency situation. *Seifert v. Milwaukee & S. T. Corp.* (1958), 4 Wis. (2d) 623, 91 N. W. (2d) 236. Here the evidence is not clear who entered into the contracts for these expenses. Medical and hospital bills sent in the name of the wife are not conclusive of the existence of a contract. Neither is the source of payment. We conclude the court did not err in not allowing recovery for these expenses as an item of damage.

This appellant also claims error by the trial court in reducing the amount of an award for the impairment of her earning capacity from $3,000 to zero. The appellant was a housewife. She helped her father with the farmwork when she was in Yugoslavia. After she came to this country in 1950 and before the accident, she worked for two companies. It is not in evidence how long she worked, what kind of work she did, or what she earned. Two years after the accident she worked in a factory for four weeks earning $45 a week. She claimed she had to quit because she suffered headaches and her face began to twitch and get numb. She was successfully treated for this ailment and, although she claimed she expected to continue working, there is no evidence she again attempted to work outside of her home. We believe the trial court was not in error in holding that the testimony was not sufficient to sustain a finding of impairment of earning capacity. Impairment of earning capacity should not be confused, however, with loss of wages. Anna Fetzer had no loss of wages because she was not working at the time of the accident and had no regular employment. She received $5,000 for future disability, which included permanent residuals to her spine, head, and back, which constituted a general disability of the body of 10 per

cent. The difference between impairment of earning capacity and the effect of permanent disability on earning capacity is sometimes hard to distinguish. It is discretionary with the trial court whether to embrace the impairment of earning capacity in the same damage question covering future disability, or to submit it separately. *Sawdey v. Schwenk* (1958), 2 Wis. (2d) 532, 87 N. W. (2d) 500. There is a failure of proof here to sustain a finding of $3,000 or any amount for loss of earning capacity. The finding could only rest on speculation and conjecture. Verdicts cannot rest on such grounds. *Boutin v. Cardinal Theatre Co.* (1954), 267 Wis. 199, 64 N. W. (2d) 848.

Theresa Puhl in her appeal contends the trial court erred in reducing her award for pain and suffering from $7,500 to $2,500 and granting her an option for twenty days to accept the reduced amount or a new trial. Theresa Puhl was forty-six years of age at the time of trial. Her head, shoulders, chest, and both knees were injured in the accident and she suffered bruises generally over her body. However, she was not hospitalized but was treated by a physician in her home. She remained in bed approximately eight days. She suffered pains in her head for four months. Her shoulders bothered her for some two weeks, and her knees hurt for three or four months. Her chest also gave her trouble. During this time she was pregnant with Mary Ann and worried about the baby and was afraid that something would happen to it. At the time of the trial she testified that she was feeling all right.

The trial court reduced the amount of the award on the statutory ground that the damages were excessive. Sec. 270.49 (1), Stats. Upon appeal from such an order, this court's duty is to determine whether or not the trial court abused its judicial discretion in granting the new trial, and unless it clearly appears that there has been an abuse of judicial discretion, such order will not be disturbed.

*Boughton v. State Farm Mut. Automobile Ins. Co.* (1959), 7 Wis. (2d) 618, 97 N. W. (2d) 401. Our review of the testimony leads us to conclude there has been no abuse of judicial discretion by the trial court. The appellant has requested in her brief in the event the lower court's reduction of damages is affirmed, the date of the option commence with the date of the remittitur. This suggestion was made in the concurring opinion in *Steinfeldt v. Pierce* (1957), 2 Wis. (2d) 138, 85 N. W. (2d) 754. This appellant did not elect to take the reduced amount within the twenty days and judgment was entered granting a new trial. We believe that when a person appeals from an order reducing the jury's award and granting an option for a new trial, such person should have the benefit of the option if requested of this court in the event the order is sustained. The appellant should therefore be permitted to accept the award of $2,500 within twenty days from the date of the remittitur. If she elects to take such reduced amount, the judgment offered should be set aside as to her and a judgment granted for $2,500 damages. Otherwise, the order granting a new trial on the issue of damages should stand.

The appeal of Mary Ann Puhl presents two questions: 1. Whether there is sufficient evidence to prove the accident caused her to be born a Mongoloid. 2. Assuming causation, does Mary Ann have a cause of action for such prenatal injury sustained by her when she was not viable? When the accident happened Mary Ann's mother, Theresa Puhl, was about twelve weeks pregnant.

Dr. Schuenzel, who did not qualify as an expert or specialist on causes of Mongolism, testified that Mongolism could be caused by a lack of oxygen to the fetus about the thirteenth week of pregnancy. This doctor had made some study of Mongoloids in this country and in Europe. He stated that it was his opinion to reasonable medical certainty that the accident caused Mary Ann to be born a Mongoloid.

In his explanation he relied on Dr. Ingalls of the Harvard University Medical School, admitted to be one of the outstanding authorities on Mongolism. Dr. Ingalls' view is that lack of oxygen to the fetus would damage the formation of the brain tissue or cells, resulting in a deformed brain and an abnormal development, or underdevelopment, of the brain. Dr. Schuenzel was of the opinion that the injuries received by Theresa Puhl in the accident could have loosened her placenta, thereby reducing the amount of oxygen to the fetus. He was also of the opinion that Theresa Puhl's emotional upset would affect the adrenal cortex glands and swamp her blood with hormones which would act as a brake upon the development of the child.

There was testimony that during the Second World War women in countries which were bombed gave birth to more Mongoloids than during other periods. The conclusion was drawn that this resulted from the severe mental disturbance of the mothers during pregnancy. There is also some evidence to the effect the parents of Mary Ann did not know of any Mongolism in their ancestry; that they were free from venereal disease; and free from a certain type of blood. There was no proof that such factors would cause Mongolism. There was testimony that, proportionately, women over forty give birth to more Mongoloids than mothers under forty. Theresa Puhl was approximately forty-two years of age at the time of conception.

Dr. Toussaint testified on behalf of the respondent that in his opinion Mongolism is caused by an immature or defective sperm or egg, but that his opinion was speculative. Dr. Toussaint is not an expert or specialist on causes of Mongolism but had studied Mongoloids in connection with his work at Northern Wisconsin Colony Training School. He was of the opinion that the age of the mother is a great factor in causing Mongolism. He testified that medical literature on the subject was not extensive and he believed

there is no known specific cause of Mongolism, although there are many theories as to cause. He did not disagree with the views of Dr. Ingalls but characterized them as a theory.

In order for the jury to award $50,000 to Mary Ann it would have to be convinced that the negligence of the defendants in a direct chain of causation was responsible for Mary Ann's being born a Mongoloid. The most the evidence shows or tends to prove is that under one theory of the cause of Mongolism it was possible that the mother of Mary Ann was so injured that Mary Ann was born a Mongoloid. From the testimony there are causes of Mongolism unknown to medical science. There is no testimony that the generally recognized medical authorities on Mongolism have agreed what causes this deformity. While it may be assumed that Dr. Ingalls' explanation is correct, there was no testimony of an impairment of the functioning of Theresa Puhl's body whereby the proper amount of oxygen was restricted by a dislocated or damaged placenta.

The opinion of Dr. Schuenzel as to the cause of Mary Ann's Mongolism was not based on clear and convincing evidence that such cause of Mongolism was the consensus of medical and scientific opinion. True, there is usually no requirement that before an expert may give an opinion he must demonstrate that most, or all, or many, other experts would agree with his opinion. However, the medical testimony given here is not of an expert in this field of medicine, and his opinion was based on the views of one authority out of several. When scientific or medical theories or explanations have not crossed the line and become an accepted medical fact, opinions based thereon are no stronger or convincing than the theories. While this court has gone a long way in admitting expert testimony deduced from well-recognized scientific and medical principles or discoveries, nevertheless, the facts from which the opinion is made must be

sufficiently established to have gained general acceptance in the particular medical field in which they belong. Otherwise, the opinion is based not on facts but conjecture. In an attempt to impeach a narcotic addict on medical opinion that drug addicts were unworthy of belief, this principle was applied in the recent case of *People v. Williams* (1959), 187 N. Y. Supp. (2d) 750, 159 N. E. (2d) 549.

We conclude there was not sufficient credible proof of causation to sustain any award to Mary Ann for her condition. However, the trial court dismissed Mary Ann's complaint on the basis of *Lipps v. Milwaukee E. R. & L. Co.* (1916), 164 Wis. 272, 159 N. W. 916, which held no cause of action accrued to an infant for injuries received while *en ventre sa mere* and before it could be born viable. The case pointed out very cogent reasons could be urged for a contrary rule where the infant is viable. In view of our conclusion that the cause of Mary Ann's Mongolism was not sufficiently proved it is not necessary to determine whether this court should, in the light of recent cases and more medical knowledge, overrule the *Lipps Case.* However, the importance of this problem compels us to point out the present status of the law.

The *Lipps Case* and cases preceding it were decided on the theory that a child during pregnancy was a part of its mother and, not being a person *in esse* at the time of injury, had no rights, and no cause of action could accrue for any prenatal injury. This line of reasoning found its origin in *Dietrich v. Northampton* (1884), 138 Mass. 14, 52 Am. Rep. 242. No recovery was allowed on the theory that the nonviable infant was not a person at the time of injury within the meaning of the wrongful-death statute, since it was a part of its mother. In 1900 the Illinois supreme court denied recovery to a child born crippled as a result of an injury suffered shortly before birth. *Allaire v. St. Luke's Hospital* (1900), 184 Ill. 359, 56 N. E. 638. There was a

vigorous dissent. In 1953 the case was overruled and it was held that a viable child could recover. *Amann v. Faidy* (1953), 415 Ill. 422, 114 N. E. (2d) 412.

Lately the majority of the courts considering this problem have held recovery could be had for injuries sustained by an infant while a viable fetus. See 10 A. L. R. (2d) 1059. In 1951 New York allowed recovery to an infant while viable. *Woods v. Lancet* (1951), 303 N. Y. 349, 102 N. E. (2d) 691. Recovery was extended in 1953 to a nonviable child. *Kelly v. Gregory* (1953), 282 App. Div. 542, 125 N. Y. Supp. (2d) 696.

The denial of recovery for prenatal injuries in the older cases was also grounded on practical considerations—the inherent difficulty in the proof of causation and recovery would lead to false or fictitious claims. Another reason in common-carrier cases was the defendant, being a common carrier, owed no contractual duty to the infant but only to its mother. *Walker v. Great Northern R. Co.* (1891), 28 L. Rep. Ir. 69, is a typical example of this reasoning.

It might be said, however, that the underlying rationale for denying recovery for prenatal injuries was founded on the concept adopted by the common law that a person does not become a separate and distinct legal entity or human being capable of possessing rights until birth. What is now known as the viable theory is based on medical knowledge and even on common knowledge that a child in the viable stage can and does live separately in the womb of its mother and can live and exist as an independent person if born in that stage. Based on this knowledge the courts began to allow recovery for injuries sustained while the child was viable. This reasoning was adopted in 1933 by the supreme court of Canada. *Montreal Tramways Co. v. Leveille* (1933), Can. Sup. Ct. Rep. 456, 4 D. L. Rep. 337, and by the *Amann* and *Woods Cases, supra,* and other cases. This reasoning has been followed by the states of Connecticut,

Georgia, Illinois, Maryland, Missouri, New Hampshire, New York, and Oregon.

The viability theory has been challenged as unrealistic in that it draws an arbitrary line between viability and non-viability, and fails to recognize the biological fact there is a living human being before viability. A child is no more a part of its mother before it becomes viable than it is after viability. It would be more accurate to say that the fetus from conception lives within its mother rather than as a part of her. The claim of a child injured before viability is just as meritorious as that of a child injured during the viable stage. The proof of such injury, of course, may be more difficult.

There is much that can be said for the biological theory. At least it is a more-logical view. Under this theory an unborn infant is not treated as a legal person but as a separate entity or human being in the biological sense from conception, having a potentiality of personality which is not realized until birth. Injuries suffered before birth impose a conditional liability on the tort-feasor. This liability becomes unconditional, or complete, upon the birth of the injured separate entity as a legal person. If such personality is not achieved, there would be no liability because of no damage to a legal person. Three states have accepted this theory as a basis for allowing recovery. *Hornbuckle v. Plantation Pipe Line Co.* (1956), 212 Ga. 504, 93 S. E. (2d) 727; *Bennett v. Hymers* (1958), 101 N. H. 483, 147 Atl. (2d) 108; *Kelly v. Gregory, supra.*

Persuasive arguments for recovery have been made from the field of criminal law. If a child is not a living entity, why should abortion be illegal? True, the criminal law is based on public policy, but this public policy is based on the belief that it is wrong to deprive a living fetus of its right to be born. If an unborn child may not be legally deprived of life, why may that life be impaired by the negligence of another

person without responsibility? In *State v. Walters* (1929), 199 Wis. 68, 225 N. W. 167, the court held it was murder for a person to unlawfully beat the mother of a child with the result that the child was born alive but died as a result of such prenatal injuries. In the Criminal Code of Wisconsin, sec. 940.04, Stats., abortion refers to an unborn child, and sub. (6) defines an unborn child as "a human being from the time of conception until it is born alive." The protection of property rights of an unborn child in the law of real property, the law of descent and distribution, and in the administration of wills raises the question of whether property rights should be more important than the right to be compensated for being born deformed or injured through the negligence of another.

There is much to commend the biological theory of recovery on moral grounds. Adequate safeguards against fraudulent claims can be devised. Such claims are not unknown in the law. If the common law has any vitality, it has been argued that it should be elastic enough to adapt itself to current medical and scientific truths so as to function as an efficient rule of conduct in our modern, complex society. For excellent discussions of these theories, see 26 Fordham Law Review, 684, 1951 Wisconsin Law Review, 518, and "The Development of the Remedy for Prenatal Torts," Vol. 2, No. 5, p. 33, Personal Injury Commentator for September, 1959. Excellent annotations discussing the cases on this problem will be found in 10 A. L. R. (2d) 1059, and 27 A. L. R. (2d) 1256.

The last question is whether the trial court erred in awarding fees to the guardian *ad litem* for Mary Ann against the successful defendants. This was done under sec. 256.48, Stats. This section provides in part: "Wherever the statutes do not specify who shall pay the fee of the guardian *ad litem,* the court shall order payment of his fees to be made by the party which the court determines should bear this cost."

This section should not be applied to this situation. Sec. 271.04 (2), Stats., includes guardian *ad litem* fees as taxable costs recoverable by a successful litigant. This is evidence that an unsuccessful litigant cannot recover such costs. Sec. 256.48 is general in its terms. There is no specific provision that a court can order guardian *ad litem* fees to be paid by a successful litigant. Originally this section was added by ch. 107, Laws of 1953, to sec. 324.29 (2). It was designated sec. 324.29 (2m) in the 1953 statutes and related to guardian *ad litem* fees in the county court. By ch. 165, Laws of 1955, sec. 324.29 (2m) was renumbered sec. 256.48 and apparently was intended to have general application to all courts. Prior to the creation of this section, it was the general rule that guardian *ad litem* fees should be paid by the ward. *Tyson v. Richardson* (1899), 103 Wis. 397, 79 N. W. 439.

In *Will of McNaughton* (1909), 138 Wis. 179, 191, 197, 118 N. W. 997, this court in affirming the allowance of guardian fees to be paid out of an estate said: "Generally speaking, it must be conceded that no inherent power exists in courts to take the property of one person and devote it to the benefit of another, and that the legislature cannot, legitimately, authorize such proceeding, as by taking the property of the successful party in litigation to pay the expenses incurred by his adversary in the controversy." In this case the court in discussing the statute (now sec. 324.13 (2)), which provided that a guardian *ad litem* fee could be fixed by the court and "paid out of the body of the estate or property in controversy," reasoned that the statute dealt with a subject matter in the nature of an action *in rem* and met the constitutional objections by allowing the guardian *ad litem* fees from the res and was justified as a necessary judicial aid.

The litigation here is not in the nature of a probate proceeding or a proceeding *in rem*. Because of the indefiniteness

of sec. 256.48, Stats., where no standard is set up for the court to determine who should bear the cost, it should not be applied to burden the successful party with expenses of litigation because the unsuccessful party has no funds to pay them.

*By the Court.*—That part of the judgment appealed from by Anna Fetzer is affirmed. That part appealed from by Theresa Puhl is affirmed unless within twenty days from the date of the remittitur Theresa Puhl elects to take the award of $2,500, in which event the circuit court is directed to set aside the judgment granting a new trial to her and enter judgment for said amount of damages. That part of the judgment appealed from dismissing the complaint of Mary Ann Puhl is affirmed. That part of the judgment appealed from granting Mary Ann Puhl, a minor, by Eugene E. Kershek, her guardian *ad litem,* $850 fees is reversed.

FAIRCHILD, J. (*dissenting in part*). I would prefer that the option given to Mrs. Puhl would not be in the lowest amount that a jury would probably assess, but in an amount fixed by the trial court as a fair and reasonable award under the evidence. My reasons for this view were stated in an opinion filed in *Gennrich v. Schrank* (1959), 6 Wis. (2d) 87, 93, 93 N. W. (2d) 876.