SCHULZ, and husband, Respondents, v. ST. MARY'S HOSPITAL, Appellant.

*No. 75–465. Argued November 30, 1977.—
Decided January 3, 1978.*
(Also reported in 260 N.W.2d 783.)

640

For the appellant there were briefs by *Merten, Connell & Sisolak, S. C.* and oral argument by *Paul E. Schwemer,* of counsel, all of Milwaukee.

For the respondents there was a brief by *Robert L. Habush, Gary R. Kuphall,* and *Habush, Gillick, Habush, Davis & Murphy,* and oral argument by *Robert L. Habush,* all of Milwaukee.

ROBERT W. HANSEN, J. While the central issue on this appeal relates to the damage awards made by the jury, and whether the evidence in this record sustains them, discussion will begin with the other issues raised.

*NEGLIGENCE OF THE PLAINTIFF.*

One of the special verdict questions asked the jury whether, the hospital having conceded negligence in serving urn cleaner on a patient's tray, the plaintiff was also negligent in taking the two swallows and one sip. The defendant hospital requested the trial court to answer

this question in the affirmative as a matter of law. The trial court refused and the jury found that plaintiff was not negligent with respect to her own safety.

As to plaintiff's negligence, the law in this state is that, if the danger here was discoverable in the exercise of ordinary care, plaintiff was, as a matter of law, negligent for her own safety.[1] As to the first swallow of the cleaning fluid, there is no claim of negligence on the plaintiff's part. It is in taking two swallows and a third sip that, defendant claims, plaintiff did not exercise ordinary care for her own safety. She knew by then that the liquid was not coffee or tea, was not warm, tasted very salty and gave her a burning sensation. The question is close as to whether a reasonably prudent person, exercising ordinary care for his or her own safety, would or would not have stopped sampling the fluid after the first swallow. However, even the head nurse and the orderly tasted the liquid with full notice that it had caused a burning sensation in the mouth and throat of the plaintiff. Given the hospital setting, it cannot reasonably be expected that the plaintiff's realization that what had been served in the stainless steel pot was not a beverage for human consumption would be instantaneous.

In ruling on a motion for directed verdict the trial court must view the evidence in the light most favorable to the party moved against and can direct the verdict only when the evidence gives rise to no dispute on the material issues or only when the evidence is so convincing as reasonably to permit unbiased and impartial minds to come to but one credible conclusion.[2] Applying that

[1] *Balas v. St. Sebastian's Congregation,* 66 Wis.2d 421, 225 N.W.2d 428 (1975). *See also:* Restatement of Torts (Second), sec. 466 (1965).

[2] *Bentzler v. Braun,* 34 Wis.2d 362, 370, 149 N.W.2d 626 (1967).

test, we find no error in the trial court's not finding the plaintiff negligent for her own safety as a matter of law.

## HOSPITAL RECORDS.

The plaintiff was hospitalized in Elmhurst, Illinois, on five occasions prior to the visit to the defendant hospital. Three of the five hospital stays were to deliver a child; one was for a varicose vein ligation; and one was for removal of her gallbladder. The plaintiff's trial counsel sought the admission of the Illinois hospital records, under the business records exception to the hearsay rule,[3] identifying them through the testimony of the doctor who had delivered the last child and performed the ligation and who assisted in the gallbladder surgery. Photostatic copies of the hospital records were admitted into evidence by the trial court. The defendant contends that the admission of these records violated secs. 910.01, 910.02, 910.03 and 908.03(6), Stats. However, the reliance on secs. 910.01, 910.02 and 910.03, Stats., is misplaced. These photostatic copies are counterparts produced by a technique which accurately reproduces the original and therefore are "duplicates" under ch. 910, Stats., and admissible to the same extent as an original unless a genuine question as to the authenticity of the original is raised or unless it would be unfair to admit them.[4] While we conclude that this test is met, we hold that admissibility of hospital records is governed by sec. 909.015(1), Stats., permitting the authentication of a physical evidence to be made by a witness with knowledge that a matter is what it is claimed to be, and sec. 908.03 (6), Stats., providing that records or data compilations may be introduced by "the testimony of the custodian or

---

[3] Sec. 908.03(6), Stats.
[4] Sec. 910.03, Stats.

other qualified witness."[5] Absent some showing by the defendant that the records which were admitted were untrustworthy, the doctor here was such "other qualified witness." In the case before us an expert medical witness for the defendant, Dr. Enzer, based portions of his testimony on the admitted records, hardly suggesting that they were not authentic or untrustworthy.

## CAUSATION OF HEPATITIS.

The defendant hospital contends that the evidence in this record does not support the jury's conclusion that swallowing two or three cubic centimeters of diluted trisodium phosphate caused the liver damage from which the plaintiff apparently suffered the very next day. As this court said in the case where the claim was that injuries to the mother in an automobile accident caused the birth of a Mongoloid child, in order for the jury here to award $75,000 to these plaintiffs, "it would have to be convinced that the negligence of the defendants in a direct chain of causation was responsible"[6] for the hepatitis.

In the case before us it was not sufficient for the plaintiffs to establish that if the trisodium phosphate reached the liver it would cause liver damage. To complete the direct chain of causation required in the *Puhl Case*[7] it was necessary to establish that the trisodium phosphate that was swallowed would enter the blood-

[5] NOTE: Since this case was tried, the Wisconsin Code of Evidence has been amended to permit the parties to dispense entirely with the testimony of a custodian or other qualified witness as to hospital records, providing that party offering the records files in court an accurate certified duplicate at least ten days before trial or hearing. *See:* Sec. 908.03(6m)(a), Stats.

[6] *Puhl v. Milwaukee Automobile Ins. Co.,* 8 Wis.2d 343, 353, 99 N.W.2d 163 (1959).

[7] *Id.*

stream and reach the liver of this plaintiff. As Dr. Holmburg, one of the medical witnesses for the plaintiff, stated: "In order to say that it was the cause of the liver injury, we have to assume that it got in the bloodstream and reached the liver to damage it." Asked how he knew that absorption had occurred, Dr. Holmburg answered, "I cannot prove that."

As to this needed link in the chain, Dr. Enzer, a pathologist as well as an internist, testified for the defendant hospital that trisodium phosphate could not enter the bloodstream and could not reach the liver. Asked to trace the course of trisodium phosphate through the system, Dr. Enzer testified that there would be no absorption into the bloodstream and therefore no effect on the liver because, upon reaching the stomach, the alkalinity of trisodium phosphate would be immediately reduced by the acid juices of the stomach to monosodium phosphate. Monosodium phosphate, rather than being absorbed into the system, would draw fluid out of the system, would have a laxative effect and pass through the bowels without reaching the liver. Lay persons might assume that any substance swallowed makes its way into the bloodstream and liver. But in the light of Dr. Enzer's testimony that the trisodium phosphate swallowed could not reach either bloodstream or liver, this jury was not entitled to conclude the contrary unless some positive, contradicting testimony is contained in the record. For this court has held that: "It is certainly true that a jury may not disregard '[p]ositive uncontradicted testimony as to the existence of some fact, or the happening of some event . . . in the absence of something in the case which discredits the same or renders it against reasonable probabilities.'"[8]

---

[8] *Lopez v. Prestige Casualty Co.*, 53 Wis.2d 25, 28, 191 N.W.2d 908 (1971), quoting *Thiel v. Damrau*, 268 Wis. 76, 85, 66 N.W.2d 747 (1954); and *in accord: State v. Public Service Comm.*, 16 Wis.2d 231, 238, 114 N.W.2d 454 (1962).

In all, three medical witnesses testified on behalf of the plaintiffs. One, Dr. Livermore, a general practitioner, testified that the plaintiff's stomach x-rays were normal and that he knew of no direct contact between the fluid swallowed and any internal organs, liver included, adding: "Frankly, I know nothing about trisodium phosphate . . . so I have no opinion concerning trisodium phosphate." He stated that he preferred not to testify as to toxic hepatitis and the chemical relationship between trisodium phosphate and toxic hepatitis. This testimony neither supplies the missing link that the trisodium phosphate reached the plaintiff's liver, nor contradicts Dr. Enzer's testimony.

Dr. Hootkin, an internist who practices gastroenterology, also testified for the plaintiffs that trisodium phosphate was toxic to the liver but, asked if he was assuming that the trisodium phosphate here reached plaintiff's liver, answered, "I am—I am concluding that." Examined as to the time it takes for the trisodium phosphate to reach the liver, Dr. Hootkin answered, "Toxicologically, I am not qualified to answer if it is feasible." Asked whether he considered himself an expert in the toxology field, he answered, "I do not." Dr. Hootkin further testified that he was not familiar with any literature linking the ingestion of trisodium phosphate to toxic hepatitis.[9]

[9] *See: Puhl v. Milwaukee Automobile Ins. Co., supra,* n. 6, at 353, 354, where this court held: "True, there is usually no requirement that before an expert may give an opinion he must demonstrate that most, or all, or many, other experts would agree with his opinion. However, the medical testimony given here is not of an expert in this field of medicine, and his opinion was based on the views of one authority out of several. . . . While this court has gone a long ways in admitting expert testimony deduced from well-recognized scientific and medical principles or discoveries, nevertheless, the facts from which the opinion is made must be sufficiently established to have gained general acceptance in the particular medical field in which they belong. Otherwise, the opinion is based not on facts but conjecture."

Plaintiff's counsel elicited Dr. Holmburg's testimony that her hepatitis was caused by the ingestion of urn cleaner by means of a hypothetical question. In that hypothetical question the plaintiff's counsel asked Dr. Holmburg to assume the plaintiff's medical history up to the date of trial and her testimony concerning the ingestion of the fluid and her symptoms thereafter. However, on cross-examination Dr. Holmburg was asked if he also assumed that the trisodium phosphate reached the liver. He answered, "Yes, I make that assumption."

According to the landmark case on the use of hypothetical questions, *Rabata v. Dohner,*[10] Dr. Holmburg, an internist who was one of the plaintiff's treating physicians, could have given his opinion directly without the use of a hypothetical question. However, *Rabata* does not change the prior rule that if counsel chooses to use a hypothetical question, the question must be based on assumptions that have some support in the evidence.[11] To be sure, all of the assumptions need not be uncontroverted. In fact, as we said in *Rabata,* hypothetical questions are particularly useful when the facts are disputed because the jury is better able to reject the expert conclusion once it decides not to believe the assumed facts on which the conclusion is based.[12] However, if at the close of the evidence there is no basis to enable the jury to find the assumed facts to be true, both the hypothetical question and the answer are subject to a motion to strike.

The defendant's counsel objected to the hypothetical question at the time it was formulated. This objection was properly overruled by the trial court at that time.

[10] 45 Wis.2d 111, 126, 172 N.W.2d 409 (1969).
[11] *Kreyer v. Farmers' Co-operative Lumber Co.,* 18 Wis.2d 67, 117 N.W.2d 646 (1962).
[12] *Rabata v. Dohner, supra,* n. 10, at 123.

However, the defendant did not renew its objection to the question at the completion of the testimony, when it became clear after Dr. Enzer's testimony that at least one of the crucial assumptions of the question had no evidentiary basis whatsoever. By not making a motion to strike, the defendant thus waived its final opportunity to object to Dr. Holmburg's testimony. However, it did not thereby waive its challenge to the sufficiency of the evidence, taken as a whole, to support the jury's verdict. In the testimony of the three medical witnesses for the plaintiff, none of which claimed to be expert in the field of toxology or in the processes by which ingested toxic substances pass through the system, we find no contradiction of Dr. Enzer's testimony that physiologically the ingested trisodium phosphate could not reach the plaintiff's liver. The plaintiff failed to supply a needed link in the direct chain of causation that the trisodium phosphate she swallowed at the hospital entered her bloodstream and reached her liver.[13]

We find that with the chain of direct causation not here established, that portion of the total damage award attributable to the chronic active hepatitis must be held to be based on speculation and conjecture. Since the portion of total damages attributable to the claim of hepatitis cannot be separated from damages resultant from other injuries sustained by this plaintiff, the damage awards must be set aside.

## FORM OF VERDICT.

The trial court in this case submitted to the jury the standard short-form special verdict, including the single

[13] *Lopez v. Prestige Casualty Co.*, *supra*, n. 8, at 28, where this court held: "However, proof of an accident and proof of an injury do not, ipso facto, establish that such injury was caused by such accident. The two must be linked to establish liability, and there must be a finding of liability to require an award of damages."

question on causation: "Was such negligence on the part of the defendant, St. Mary's Hospital, a cause of the injury to the plaintiff?" The defendant hospital conceded that its negligence caused the plaintiff some temporary pain and suffering from swallowing the trisodium phosphate. Accordingly, the defendant requested an additional verdict question asking whether the hepatitis from which plaintiff suffered at the time of trial was caused by the swallowing of trisodium phosphate. The trial court refused to submit to the jury this additional fact question. In addition, the trial court refused to instruct the jury that when it awarded damages, it must only award damages for hepatitis if it first concluded that the swallowing of trisodium phosphate caused those damages. The instructions given did not differentiate between the causation of temporary discomfort and the causation of chronic active hepatitis.

While it is not recommended "in mine-run personal injury actions that the jury be interrogated as to whether certain particular injuries of plaintiff were caused by the accident," our court has held that where, as in the case before us, ". . . plaintiff's damages resulting from an accident would be minimal unless a particularly serious mental or physical condition was also caused by the accident in question, and there is sharp conflict in the testimony as to whether such serious condition was caused by the accident, then a question [inquiring as to an additional fact] . . . is proper and often advisable."[14] Such special fact questions have been termed "useful tools."[15] While the form of a special verdict is a matter largely within the discretion of the trial court,[16] we

[14] *Chapnitsky v. McClone,* 20 Wis.2d 453, 463, 464, 122 N.W.2d 400 (1963).

[15] Decker & Decker, *Special Verdict Formulation,* 60 Marq. L. Rev. 201, 225 (1977).

[16] *Liberty Tea Co. v. La Salle Fire Ins. Co.,* 206 Wis. 639, 238 N.W. 399 (1932).

hold, under the circumstances of the case before us, the submission of the special verdict question requested by the defendant was not only advisable, but required, and it was an abuse of trial court discretion to refuse to do so. Refusing to submit the additional question not only came close to the edge of the cliff, it fell over it.

The fact that the jury did not have an opportunity to answer this special fact question strengthens our court's opinion that the major issue in the case of whether the trisodium phosphate reached the liver and caused the hepatitis was not fully tried. The jury's consideration was not aided here by either the form of the verdict or the instructions, neither of which were tailored to fit the unusual circumstances of this case. The jury was entitled to a more specific presentation of the most important factual issue in this case, important both as to causation and as to the extent of damages. Our review of the entire record in this case makes it apparent that the real issues in this case have not been fully tried[17] and in our discretion, as provided in sec. 251.09, Stats., we remand the cause for a new trial on all issues in the interests of justice.

## LOSS OF EARNING CAPACITY.

Because we have set aside the jury's verdict and ordered a new trial, we need not reach the defendant's challenge to the award for loss of earning capacity. Nonetheless, we here analyze the shortcomings of the proof of lost earning capacity in this record to make clear the requirements of any such award on retrial.

The jury awarded plaintiff $25,000 for loss of future earning capacity. At the trial the plaintiff testified that she had worked part-time as a teacher of typing and shorthand. The plaintiff also testified that she experi-

---

[17] *Compare: Schmidt v. Mueller*, 53 Wis.2d 311, 321, 193 N.W. 2d 161 (1972).

ences fatigue and must take daily naps. Dr. Holmburg testified that this fatigue could interfere with her capacity to earn a living. Dr. Hootkin also testified that the hepatitis from which she suffers would reduce her earning capacity since she will continue to suffer fatigue and faces the threat of more serious liver trouble. No evidence was presented as to what the plaintiff earned previously as a part-time teacher nor what the salary of a part-time typing and shorthand teacher was or what increases in such salary were likely to occur in the future.

The issue raised by this evidence is not as to the existence of lost earning capacity. The issue is as to the sufficiency of the evidence to enable the jury to measure the loss sustained. Facing this same issue in a recent-enough case, the *Ianni Case*,[18] our court held that: " 'The burden is on the plaintiff to establish to a reasonable certainty the damages sustained. The jury is not allowed to speculate. . . .' "[19] In setting a proper basis for the measurement of damages as to loss of future earning capacity, our court in *Ianni* prescribed:

" 'The process of ascertaining the amount of compensation to be awarded requires (1) the determination of the extent to which such capacity has been diminished, and (2) the fixing of the amount of money which will compensate for the determined extent of impairment.
" 'The extent of the diminution or impairment of earning capacity is generally to be arrived at by comparing what the injured party was capable of earning at or before the time of the injury with what he was capable of earning after it occurred. . . .' "[20]

---

[18] *Ianni v. Grain Dealers Mut. Ins. Co.*, 42 Wis.2d 354, 166 N.W.2d 148 (1969).

[19] *Id.* at 364, quoting some general rules set forth by Prof. James D. Ghiardi in his book, *Personal Injury Damages in Wisconsin* (1964), ch. 8.

[20] *Id.* at 364, quoting Ghiardi, *supra*, n. 19.

These were termed "essential elements" and "basic requirements" for awards for loss of earning capacity.[21] In the case before us these requirements were not met. To begin with, the evidence does not establish impairment of the plaintiff's ability to get or hold a job. Neither the plaintiff nor her doctors claimed that she was completely unable to work. Her testimony as to fatigue and the necessity of taking daily naps does not establish the inability to be gainfully employed. As our court has held, " '. . . mere proof of a permanent injury is not conclusive evidence of impairment of future earning capacity. . . .' "[22] Certainly the evidence in this case does not establish total impairment of future earning capacity.

In addition to establishing the degree of impairment of earning capacity the plaintiff must establish what amount of money would compensate her for that impairment. The evidence must be sufficient to enable the jury to estimate with reasonable probability what would have happened had the injury not occurred. In so doing the jury " '. . . must take into account past earnings, if they are of a character that gives rise to inferences as to the future, and must discount these inferences in the light of common knowledge.' "[23] Thus, in *Ianni*, this court found that the record indicated that plaintiff had worked prior to the accident, ". . . but it was not in evidence how long she worked, what kind of work she did or, most important, what she had actually earned."[24] Given lack of information regarding earnings, we there held the ". . . testimony not to be sufficient to sustain a

[21] *Id.* at 364.

[22] *Id.* at 364, quoting Ghiardi, *supra*, n. 19.

[23] *Id.* at 366, quoting *Monsos v. Euler*, 216 Wis. 133, 139, 256 N.W. 630 (1934).

[24] *Id.* at 365, citing *Puhl v. Milwaukee Automobile Ins. Co.*, *supra*, n. 6.

finding as to loss of wages. The full information as to prior employment and prior actual earnings appears to us to be essential in giving to the jury the facts as to past employment as an aid to determining future earning capacity."[25] That was not done in this case. No evidence of the plaintiff's previous earnings was presented. While proof of lost earning capacity is different in cases involving loss of earning capacity on the part of children,[26] where as here the plaintiff is an adult with a prior work record, the rule requiring evidence of her prior earnings is clear. As we said in *Ianni*, we say here: "[W]ith no foundation laid as to prior actual earnings of the plaintiff Isabel, we are forced to conclude that this jury was invited to speculate or conjecture as to the amount of future losses of earning capacity of plaintiff Isabel. On this record, we do not see how they could have done otherwise. Verdicts cannot be permitted to rest upon speculation or conjecture."[27] Thus even if the evidence supported a finding that the swallowing of trisodium phosphate caused the plaintiff's hepatitis, we would be required to set aside the jury award of damages for loss of future earnings.

In its brief on appeal the defendant hospital urged this court to reverse or set aside the judgment and order a

[25] *Id.* at 365, citing *Puhl v. Milwaukee Automobile Ins. Co., supra,* n. 6.

[26] Evidence of prior earning or employment is not necessary to sustain an award for loss of earning capacity for a child. *See: Allen v. Bonnar,* 22 Wis.2d 221, 225, 125 N.W.2d 570 (1963) (involving a three and one-half year old child); and *Peil v. Kohnke,* 50 Wis.2d 168, 184 N.W.2d 433 (1971) (involving a sixteen-year-old plaintiff who had not worked prior to the injury). *See also: Illinois Central Railroad Company v. Staples,* 272 F.2d 829 (8th Cir. 1959) (involving a sixteen-year-old girl).

[27] *Ianni v. Grain Dealers Mut. Ins. Co., supra,* n. 18, at 366, citing *Boutin v. Cardinal Theater Co.,* 267 Wis. 199, 64 N.W.2d 848 (1954). *See also: Skow v. Green Bay & Western R. R.,* 141 Wis. 21, 29, 123 N.W. 138 (1909).

new trial, contending that "the points previously covered in this Brief, individually and collectively, warrant a new trial."[28] We agree that they do. Having found that the real controversy has not been fully tried and in furtherance of the interests of justice, we set aside the judgment and order a new trial as provided for in sec. 251.09, Stats.

*By the Court.*—Judgment reversed and cause remanded for a new trial on all issues.

---

[28] Appellant's Brief at 31.