**PEFFER et al., Appellants,**

v.

**CLEVELAND CLINIC FOUNDATION et al., Appellees.**

[Cite as *Peffer v. Cleveland Clinic Found.,* 177 Ohio App.3d 403, 2008-Ohio-3688.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 90194.

Decided July 24, 2008.

Paul W. Flowers Co., L.P.A., and Paul W. Flowers; and Becker & Mishkind Co., L.P.A., and Michael F. Becker, for appellants.

Richard R. Strong; and Sutter, O'Connell, Farchione Co., Joseph A. Farchione, David J. Hudak, John V. Jackson, David W. Skall, Christina J. Marshall, and Thomas H. Terry, for appellees.

MARY EILEEN KILBANE, Presiding Judge.

{¶ 1} This is an appeal from the Cuyahoga County Common Pleas Court wherein plaintiffs-appellants, Jason Peffer ("Jason"), a minor, by and through his natural mother, Lynn Peffer ("Peffer"), as an individual (collectively referred to

as appellants), appeal a verdict for defendants-appellees after a jury trial. Defendants-appellees are the Cleveland Clinic Foundation, K.V. Gopalakrishna, M.D. (a.k.a. Dr. Gopal), and I.D. Consultants, Inc. ("I.D.") (collectively referred to as appellees). For the following reasons, we reverse and remand.

{¶ 2} On July 22, 1997, Jason, then 11 months old, was referred to Fairview General Hospital ("FGH"), a Cleveland Clinic hospital, by his family physician, George Seikel, M.D. and was admitted. His symptoms, according to the FGH chart, were high fever, irritability, listlessness, and lethargy. On that date, Dr. Seikel requested a consultation with Dr. Gopal, an infectious-disease specialist at FGH.

{¶ 3} On July 23, 1997, at approximately 5:30 a.m., Peffer observed that Jason had become completely nonresponsive. Alarmed, she immediately called for hospital staff. A spinal tap was performed shortly thereafter, which showed inflammation of Jason's central nervous system.

{¶ 4} On that same day, July 23, 1997, Dr. Gopal responded to Dr. Seikel's request for a consultation. He was aware of the early morning episode. Dr. Gopal diagnosed viral meningitis and ordered a computer tomographic scan ("CT scan"). A radiologist at FGH, Dr. Fachtna Carey, reviewed the CT scan of Jason's head and wrote the following in his report:

There is suggestion of subtle hypodensity over the medial aspects of the temporal lobes, particularly on the left; this is of uncertain significance, but I cannot exclude medial temporal lobe inflammatory process, especially on the left. If clinically indicated, follow-up MRI may be helpful.

Impression: No discrete focal abnormality identified.

Cannot exclude subtle abnormality in medial temporal lobes, esp. on left. See above discussion.

This report will be sent to the floor and called.

{¶ 5} This information was called to the floor by Dr. Carey's office to alert the staff on Jason's floor that the report was in the system and available for review. This information was also transmitted to Dr. Seikel, who in the early evening of July 23, 1997, charted the result of the CT scan as normal. Dr. Carey testified that he detected subtle hypodensities on the CT scan that he felt were real.

{¶ 6} On July 24, 1997, Dr. Gopal reviewed Dr. Carey's CT scan report. Dr. Gopal did not feel that a magnetic resonance imaging ("MRI") was clinically indicated after his review of the CT scan and after reviewing the scan with another radiologist, who, according to Dr. Gopal, also interpreted the scan as normal. However, because Jason's fevers were not subsiding, on July 24, 1997, he was transferred from Dr. Gopal's care at FGH, along with his complete

medical records and CT scan, to the pediatric infectious disease specialists at the Cleveland Clinic's main campus. Jason was transported by ambulance.

{¶ 7} Jason was initially seen by Dr. Camille Sabella. Dr. Sabella claimed to have reviewed the CT scan of Jason's head taken at FGH on July 24, 1997, with a radiologist, whom he could not identify. He did not place a note on Jason's chart until July 25, 1997, and all the chart stated was "CT head reviewed with neuroradiology → normal." Dr. Sabella does not remember the name or gender of this unknown neuroradiologist. He testified that it was unlikely that the neuroradiologist was a resident rather than an attending physician. He also testified that it was unlikely that they might have looked at only one of the films of the entire set of CT films constituting the CT scan. He did not order an MRI because the CT scan was reported to him as "normal." The treatment plan was to continue antibiotics until blood cultures remained normal for a 24–hour time period.

{¶ 8} On July 26, 1997, Jason was again examined, and blood cultures and other tests were ordered. It remained the conclusion that Jason's symptoms were suggestive of viral meningitis, and supportive care was continued. On July 27, 1997, a spinal tap was performed.

{¶ 9} On July 28, 1997, Jason's care was assumed by Dr. Sabella's partner, Dr. Johanna Goldfarb, a pediatric infectious disease specialist. Jason developed another fever, and laboratory tests for viral encephalitis and an electroencephalogram ("EEG") were ordered. The EEG was suggestive of "abnormalities in the temporal lobe," which prompted Dr. Goldfarb to order an MRI study of Jason's head for the next day, July 29, 1997. She also requested a neurology consult on July 28, 1997, which resulted in a response indicating viral encephalitis.

{¶ 10} The MRI was completed on July 30, 1997, revealing data including "very severe damage to the left temporal lobe of Jason's brain." Given that these results were indicative of herpes simplex encephalitis ("HSE"), acyclovir, an antibiotic, was ordered for Jason that day. Expert witness testimony at trial established that the only treatment for HSE is the presumptive administration of acyclovir as soon as HSE is suspected. On August 2, 1997, the results of a prolinease chain reaction test ("PCR") confirmed the existence of HSE. Specific treatment for HSE began, and Jason was initially discharged on August 6, 1997.

{¶ 11} Given the contraction of HSE, Jason had suffered profound and irreversible brain damage, requiring 24–hour special care in a highly structured setting. He will never be able to live independently and requires constant attention.

{¶ 12} On March 19, 2003, Peffer filed the instant medical-malpractice action against Dr. Gopal, his professional group I.D., and the Cleveland Clinic. Peffer

alleged that the appellees had deviated from the accepted standard of care and treatment of her son by not timely and appropriately diagnosing his condition of HSE, inexcusably preventing effective therapy, and permitting it to progress to the point of causing severe and permanent brain injury.

{¶ 13} A jury trial commenced on June 6, 2007. Appellees argued at trial that their treatment of Jason was proper and met the standard of care, as the CT scan of July 23, 1997, was determined to be "normal," and Jason's symptoms were not consistent with a diagnosis of HSE. The opinions of the unidentified radiologist at FGH and the unidentified neuroradiologist at the Cleveland Clinic, the first of whom consulted with Dr. Gopal and the second with Dr. Sabella, that the CT scan taken at FGH on July 23, 1997, was "normal," became a central issue at trial and is the subject of assignments of error that will not be addressed herein, given our ruling with regard to assignment of error five.

{¶ 14} Peffer argued that the appellees failed to meet the standard of care by missing critical, clinical signs associated with HSE, including Jason's blistered rash and the change in his mental state, especially given his mother's related observations of the startling episode in the early morning of July 23, 1997. Peffer also contended that they misread the July 23, 1997 CT scan as "normal" and should have immediately ordered an MRI given Dr. Carey's comments:

> but I cannot exclude medial temporal lobe inflammatory process, especially on the left. If clinically indicated, follow-up MRI may be helpful.

They contended that the unnamed neuroradiologist at the Cleveland Clinic who was to have read the CT scan and reported it to Dr. Sabella as "normal" misread it as such. In sum, Peffer argued that appellees were negligent in their failure to promptly suspect HSE, in failing to order an MRI to confirm or rule out the diagnosis, and in failing to start the proper treatment with acyclovir presumptively as soon as there was any suspicion of HSE.

{¶ 15} Appellees argued that they had no reason to suspect HSE given Jason's clinical history, his clinical course, and the data received from the test results performed on Jason, including what they argued was a "normal" CT scan. They argued that instead of manifesting a progressive deterioration of mental state and a constant fever, Jason's clinical course in contracting the rare condition of HSE was never pathologic or persistent in its presentation.

{¶ 16} On June 21, 2007, at the conclusion of trial, the jury found in favor of appellees.

{¶ 17} Peffer appeals, raising six assignments of error for our review. Because we find the fifth assignment of error controlling, we will not address assignments of error one through four and six.

{¶ 18} In the fifth assignment of error, Peffer contends that this case should be reversed and remanded for a new trial because the trial court erred in including in its charge to the jury an instruction regarding "alternative methods" of treatment.[1] Peffer argues that there were no alternative methods of treatment in evidence, and because of that fact, the alternative-methods-of-treatment instruction probably misled the jury in a matter substantially affecting Peffer's substantial rights. Because we find this argument persuasive and determinative, we address this assignment of error with regard to that particular instruction, finding the remaining assignments of error moot.

{¶ 19} Appellant's fifth assignment of error reads as follows:

The trial judge erred, as a matter of law, in furnishing manifestly unfair and incomplete instructions to the jury.

{¶ 20} Peffer has presented several arguments regarding error in the court's jury instructions. However, we will address only the court's decision to furnish the "different methods" instruction. We conclude that it was error to instruct the jury on different methods because there was no evidence presented by any party supporting or justifying a jury instruction regarding a different method or methods on the standard of care required by infectious disease physicians for the treatment of a child presented with HSE.

{¶ 21} At the outset, we must address the preliminary issue as to whether Peffer preserved her right to appeal this issue by a making a timely objection to the complained charge of "differing methods." Civ.R. 51(A) was amended in July 2005, and although the exact language regarding preserving an objection as to jury instructions has been slightly modified, it remains substantially consistent since the adoption of the civil rule in 1972. It now reads:

{¶ 22} Civ.R. 51(A):

On appeal, a party may not assign as error the giving or the failure to give any instruction unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. *Opportunity shall be given to make the objection out of the hearing of the jury.*

(Emphasis added.)

{¶ 23} As explained in the decision of *Merrick v. Lewis* (July 20, 1994), Montgomery App. No. 13856, 1994 WL 380493, the underpinnings of Civ.R. 51(A) are fundamental fairness, notice, and avoiding surprise. The rule contemplates the parties' submission of requested instructions in writing and the trial court's

---

1. In Ohio, a version of an "alternative methods" instruction is named the "different methods" charge found in 3 Ohio Jury Instructions (1996) 163–164, Section 331.02, ¶ 3.

review of such proposed instructions with the parties with notice of its decision as to the final set of jury instructions in regard to omission or inclusion of any particular proposed charge, or its own decision to include or omit any charge that was not proposed. Finally, it contemplates the parties' opportunity to place any objections on the record to the general charge given to the jury by the trial court outside the hearing of the jury.

> The language of Civ.R. 51(A) states that objections must be made before (1) the jury retires (2) for the purpose of commencing consideration of the verdict. Even if objections on requests had been recorded before argument there remains the right and the duty to object to general instructions. The bifurcation of the opportunity for making objections of record on requests on instructions is avoided where, as here, the court reserves the time after argument to complete the record on all objections to instructions before the jury begins consideration of its verdict. This is important because the judge is not required to incorporate the language of a written request in the general charge to the jury. The final moment for an objection is when the jury is directed to begin deliberations.

> \* \* \*

> Our conclusion is that an objection to the giving or the failure to give an instruction under Civ. R. 51(A) may be made any time prior to the time the jury begins to consider its verdict.

> \* \* \*

> Since a court speaks only from its record, the implication from the requirement that the court *inform* counsel of its proposed action upon special requests prior to argument to the jury points logically to the importance of making some record at that time. Civ. R. 51(A). Objections are not conspicuous features in trial proceedings, but this rule mandates only that a specific objection be made before the jury begins deliberations.

> The purpose of this rule is satisfied if the court is alerted to the problem and afforded an opportunity to correct error anytime before the jury begins deliberations. Only after deliberations begin is the right to object waived.

Id. at 5–7. (Emphasis sic and citations omitted.)

{¶ 24} In the case sub judice, it is undisputed that none of the parties submitted a "different methods" instruction in proposed jury instructions filed with the court: the court included this instruction on its own initiative. A review of the brief hearing on June 19, 2007, at which the court reviewed jury instructions with counsel, does not provide for our review the set of jury instructions the trial court was reviewing with trial counsel.

{¶ 25} It is not entirely clear whether any version of a "different methods" instruction was included in the set of jury instructions that the trial court provided to trial counsel for the purposes of the hearing. It is highly unlikely, however, because none of the parties included the different-methods instruction in their respective sets of proposed jury instructions filed with the court, and the instruction was not specifically discussed at the hearing on June 19, 2007. There was no objection to a different-methods instruction by any party at the hearing because the different-methods instruction was never proposed.

{¶ 26} The record does reveal that the different-methods instruction was included by the trial court in its final version of the jury instructions; namely, the final charge given to the jury on June 20, 2007. The record further reflects that the trial court did not give the parties an opportunity to object to the final charge until after the trial judge had instructed the jury, "The case is now in your hands."

{¶ 27} We agree that the first opportunity any party had to object to any particular charge in the actual set of jury instructions read to the jury was seized by all parties. Counsel for plaintiffs objected to the inclusion of the different-methods instruction and the omission of their requested "heightened care" instruction. Defendants Dr. Gopal and I.D. objected to the omission of the charge as being other than the joint proposed jury instructions of the defendants, which they indicated embodied the current law as promulgated by the Supreme Court of Ohio as jury instructions in medical-malpractice actions, which should have been read in their totality. Defendant Cleveland Clinic also objected to the court's not giving the defendants' joint proposed jury instructions and added a specific, second objection on the record; namely, that the year 1997 should have been included in the instruction regarding the standard of law when given to the jury.

{¶ 28} We find that the parties' objections to the jury charge were timely made under the circumstances, and to hold otherwise would completely eliminate the specific language of Civ.R. 51(A), which mandates that *"[o]pportunity shall be given to make the objection out of the hearing of the jury."* (Emphasis added.) The jurors had just left the courtroom and could not have started to deliberate as to the merits of the case at the time the parties placed their objections to the final charge on the record. The parties fully apprised the trial court of their respective objections to the charge at the first opportunity given, clearly in time for the trial court to correct the instruction and prior to the jurors' commencing deliberations on the substantive issues of the case.

{¶ 29} We are not persuaded that a hypertechnical interpretation of Civ.R. 51(A), now argued by appellees, is justified in the case sub judice. Such an interpretation would preclude objections to the charge after the jury left the

courtroom and was on the way to the jury deliberation room, arguing that the objection was not made "before the jury retires to deliberate." This interpretation is not justified in the absence of a recess or sidebar conference opportunity outside the hearing of the jury, prior to the jury's receiving the case for deliberations. The parties seized the first opportunity given by the trial court to voice objections to the final charge, which was just as the jurors had left the courtroom before they had time to actually commence deliberations. To hold otherwise would undermine the mandate of Civ.R. 51(A) and deprive the parties of an opportunity to preserve their objections to the final jury charge on the record and outside the hearing of the jury. It would elevate form over substance.

{¶ 30} As emphasized in *Presley v. Norwood* (1973), 36 Ohio St.2d 29, 33, 65 O.O.2d 129, 303 N.E.2d 81, "[t]he theory behind Civ.R. 51(A), like that behind Rule 51 of the Federal Rules of Civil Procedure, is 'that the court should be given an opportunity to correct a mistake or defect in the instruction when it can be accomplished during the same trial.'" Id. at 33, 65 O.O.2d 129, 303 N.E.2d 81, quoting McCormac, Ohio Civil Rules Practice, Section 12.18. It is the opportunity to correct the jury instructions prior to substantive deliberations that is the rationale of the civil rule in question.

{¶ 31} The complained-of jury instruction in question read by the trial court mirrors the instruction set forth in 3 Ohio Jury Instructions (1996) 163–164, Section 331.02, ¶ 3, and states as follows:

DIFFERENT METHODS. Although some other physician in the specialty might have used a method of treatment different from that used by defendant, this circumstance will not by itself, without more, prove that defendant was negligent. The mere fact that the defendant used an alternative method of treatment is not by itself, without more, proof of his negligence. You are to decide whether the treatment used by defendant was reasonably prudent and in accordance with the standard of care required of a physician in his field of practice.

{¶ 32} Although the Ohio Supreme Court did not completely abandon the different-methods-of-treatment instruction, it clearly held that its applicability is limited to a particular subset of medical malpractice cases.

This instruction informs the jury that alternative methods can be used and that the selection of one method over the other is not in and of itself negligence. The instruction is grounded "on the principle that juries, with their limited medical knowledge, should not be forced to decide which of two acceptable treatments should have been performed by a defendant physician."

This type of jury instruction, however, is not appropriate in all medical malpractice cases. It is well established that the trial court may not instruct the jury if there is no evidence to support an issue. By its very terms, in

medical malpractice cases, the "different methods" charge to the jury is appropriate only if there is evidence that more than one method of diagnosis or treatment is acceptable for a particular medical condition.

*Pesek v. Univ. Neurologists Assoc., Inc.* (2000), 87 Ohio St.3d 495, 498, 721 N.E.2d 1011. (Citations omitted.)

{¶ 33} We recently acknowledged the narrow application of this instruction in *Kowalski v. Marymount Hosp., Inc.*, Cuyahoga App. No. 87571, 2007-Ohio-828, 2007 WL 613865. In *Kowalski*, as in the case sub judice, the issue presented for jury adjudication was whether the appellees had failed to timely diagnose the condition given the information presented. In both *Kowalski* and in the instant case, the evidence adduced was that there was only one method of diagnosis for the particular medical condition presented. Specifically, in *Kowalski*, there was no evidence presented that more than one method was acceptable to diagnose coronary artery disease, and as in the case sub judice, there was no evidence presented that more than one method was acceptable to diagnose HSE.

{¶ 34} As mandated by the Ohio Supreme Court's holding in *Pesek*, the giving of the different-methods instruction in question is limited to cases in which the evidence demonstrates the existence of different or alternative methods for diagnosing a particular condition. Hence, it is clearly inapplicable in those cases, including the case at bar, where there was no evidence of a differing or alternative method. The difficulty with inclusion of the different-methods instruction in a "failure to diagnose" case is explained in *Kowalski*.

> However, where the issue involved is whether the physician negligently failed to diagnose a particular disease from the observed symptoms, the instruction is misleading to the jury. In such a case, the instruction implies that even where multiple conditions may exist * * * as long as the physician followed a method for diagnosing one of the potential conditions, the doctor may be absolved of negligence.

Id. at ¶ 22.

{¶ 35} Plaintiffs have the burden of proof in a medical-malpractice case and must produce expert testimony to show that action or inaction of doctors whom the plaintiffs believe committed malpractice fell below the standard of care of like practitioners under the same or similar circumstances. *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 75 O.O.2d 184, 346 N.E.2d 673. Here, Peffer's expert, Dr. Stephen Pelton, testified that the treatment by the appellees fell below the standard of care because of their failure to order an MRI and to presumptively administer acyclovir for HSE given the initial report of Dr. Carey regarding the CT scan administered on July 23, 1997. At no time did any expert for the appellees testify that there was more than one method of diagnosing and/or

treating HSE. There was absolutely no testimony or argument of even a minority view in the medical community of any other method for diagnosing and/or treating HSE.

■ {¶ 36} The central issue in the case was whether the CT scan of July 23, 1997, had been properly interpreted and whether the HSE condition was timely diagnosed. Whether appellees met the standard of care in diagnosing and treating HSE is a question of fact for a jury. By interjecting the different-methods instruction, the trial court may have caused confusion, as it gave the jury the impression that it should not find appellees negligent if they merely made a choice between alternative methods of diagnosis. The confusion that may have been caused by inclusion of such an instruction in a "failure to diagnose" case was succinctly explained in *Miller v. Kim* (1995), 191 Wis.2d 187, 528 N.W.2d 72:

> Were we to approve the "alternative method[s] of diagnosis" instruction, there would be few "failure to diagnose" cases where the instruction would not be appropriate. Such cases invariably involve an assertion that a physician failed to recognize that an observed symptom or symptoms indicated the presence of a particular disease or injury. The question in the usual "failure to diagnose" case is whether the physician was negligent in failing to recognize the significance of the symptom or symptoms. That is because the alleged negligence lies in failing to do something, not in negligently choosing between courses of action. Doing something and doing nothing are not two methods of diagnosing a disease or injury.

Id. at 198, 528 N.W.2d 72.

{¶ 37} Consequently, we conclude that there was no evidence presented at trial justifying the trial court's decision to instruct the jury on differing methods of diagnosis. We are compelled to reverse the trial court based on the Supreme Court's holding in *Pesek*. Inclusion of the different-methods instruction may have caused inextricable and irrevocable confusion requiring a new trial, as it "probably misled the jury in a matter materially affecting the complaining party's substantial rights." *Becker v. Lake Cty. Mem. Hosp. W.* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165.

{¶ 38} Accordingly, Peffer's fifth assignment of error is well taken.

{¶ 39} Peffer's remaining assignments of error are moot.

Judgment reversed<br>and cause remanded.

McMonagle and Stewart, JJ., concur.