KESSLER, P.J.
¶1 Raquel and London Barney, through London's guardian ad litem (collectively, the Barneys), appeal an order for judgment entered on a jury verdict dismissing their medical malpractice claim against Dr. Julie Mickelson, Columbia St. Mary's Hospital Milwaukee, Inc., and the Injured Patients and Families Compensation Fund. They also appeal from the trial court's denial of their request for a new trial. We conclude that the trial court erred when it instructed the jury that it should not find Dr. Mickelson negligent if she merely made a choice between alternative methods of treatment. The issue in this case is not whether Dr. Mickelson chose between two recognized methods of treatment, but whether she negligently failed to determine whether an external fetal heart monitor placed on Raquel's abdomen was accurately measuring London's heart rate and ultimately failed to recognize signs of fetal oxygen depletion. Consequently, also at issue is whether Dr. Mickelson failed to employ a more accurate method of tracing the fetal heart rate. We reverse and remand for a new trial.
BACKGROUND
¶2 Raquel was admitted to Columbia St. Mary's Hospital in Milwaukee on the evening of February 15, 2012, to induce labor and delivery of her son, London. An external fetal heart monitor was attached to Raquel's abdomen to trace London's heartbeat during the labor and delivery. Dr. Mickelson ultimately delivered London on the night of February 16, 2012. London was born nonresponsive, blue, and with limited muscle movements. A neonatologist resuscitated London. London sustained a permanent brain injury and was ultimately diagnosed with cerebral palsy.
¶3 The Barneys sued Dr. Mickelson and Columbia St. Mary's, alleging that during the hour and one-half leading up to London's delivery, the external heart monitor stopped reporting London's heart rate and instead reported Raquel's heart rate. Because the monitor was tracing the maternal heart rate, the Barneys alleged, Dr. Mickelson and her staff failed to recognize the signs of oxygen deprivation in London. The matter proceeded to trial.
¶4 The Barneys' theory of the case was that Dr. Mickelson failed to employ a more accurate available method of monitoring London's heart rate. They argued that the need for more accurate monitoring, which was available through either a pulse oximeter or a fetal scalp electrode,[1] should have been apparent to medical professionals before London's delivery. Dr. Mickelson and multiple expert witnesses testified about the events leading up to London's delivery, the methods of tracing fetal heartbeats, the signs of inaccurate tracing, and the potential harm that can result when a baby's heart rate is unknown prior to delivery.
¶5 Dr. Mickelson testified that throughout Raquel's labor, beginning on the evening of February 15, 2012, the medical staff relied on an external fetal monitor to monitor and read London's heart rate and pattern.[2] Dr. Mickelson testified that discontinuity in fetal monitoring strips, or short periods where the baby's heart rate is not recorded, is not uncommon during labor and can occur when the mother is moving or is pushing to deliver the baby.
¶6 Dr. Mickelson also testified that the absence of variability on a fetal monitoring strip can be indicative of fetal acidosis, or high levels of acid in the baby's blood caused by oxygen deprivation. Dr. Mickelson admitted that there were time periods, particularly in the last portion of Raquel's labor, where Dr. Mickelson could not obtain a good fetal tracing and could not definitively determine whether certain portions of the strips were monitoring the fetal or the maternal heart rate. Dr. Mickelson also admitted that for approximately eight minutes in the hour prior to London's delivery, she could not determine a baseline heart rate for London. Dr. Mickelson stated that a fetal scalp electrode would have provided the baby's heart rate and would have allowed her to distinguish between the maternal and fetal rates. Dr. Mickelson stated that she did not insert a fetal scalp electrode because Raquel had an infection and she did not want to place the monitor on the baby's head and risk injecting it with infected fluid. Dr. Mickelson admitted that a pulse oximeter, a noninvasive method of continually monitoring the maternal heart rate, could have been used on Raquel to eliminate any confusion between maternal and fetal heart rate tracings, but she did not employ that method.
¶7 Dr. Mickelson also presented expert testimony from multiple medical professionals, all of whom opined that Dr. Mickelson's reliance on the external monitor was within the applicable standard of care.
¶8 As relevant to this appeal, the Barneys presented the expert testimony of Dr. Bruce Bryan, an obstetrics and gynecology specialist. Dr. Bryan testified that he reviewed London's and Raquel's medical records, including the prenatal records, the labor and delivery records, the fetal monitoring strips, as well as Dr. Mickelson's deposition testimony. Dr. Bryan testified that it was his opinion that in the hours leading up to London's birth, the fetal monitoring strips showed multiple discontinuous readings, suggesting that the strips were not continuously and accurately measuring London's heart rate. Dr. Bryan stated that the medical records suggest that medical staff had difficulty measuring London's fetal tones beginning early in the morning of February 16, 2012, because a resident made a notation to consider utilizing an internal monitor once Raquel's water broke and a nurse noted that the fetal tones were "sketchy." Dr. Bryan opined that Dr. Mickelson had multiple opportunities to insert the fetal scalp electrode after Raquel's water broke at 8:30 a.m. on February 16, 2012, and that there were multiple instances where Raquel's heart beat was being monitored instead of London's. Dr. Bryan explained that certain fetal monitoring strips suggested that London was in distress and that Dr. Mickelson violated the standard of care by: leaving Raquel's bedside without having a definitive reading of London's heart beat; failing to employ an accurate method of obtaining London's heartbeat, such as a fetal scalp electrode or pulse oximeter, since there were signs the baby could be in distress; and failing to obtain an accurate fetal tone reading during the pushing stage of Raquel's labor. Dr. Bryan also stated that Raquel's infection did not prohibit use of the fetal scalp electrode.
¶9 Dr. Stephan Glass, a pediatric neurologist, testified that London's injuries were not the result of Raquel's infection, but rather were caused by umbilical cord compression and a loss of blood flow. Dr. Glass stated that London was born with dangerously high levels of acid in his blood, consistent with oxygen deprivation.
¶10 At the jury instructions conference, the defendants requested that the trial court include the "alternative methods" paragraph of WIS JI- CIVIL 1023, which states:
If you find from the evidence that more than one method of (treatment for) (diagnosing) (plaintiff )'s (injuries) (condition) was recognized as reasonable given the state of medical knowledge at that time, then (doctor ) was at liberty to select any of the recognized methods. (Doctor ) was not negligent because (he) (she) chose to use one of these recognized (treatment) (diagnostic) methods rather than another recognized method if (he) (she) used reasonable care, skill, and judgment in administering the method.
The defense reasoned:
The reason, specifically, relates to the testimony that was elicited from [Dr. Mickelson's experts] that utilizing an external monitor was a recognized method of treatment for monitoring this labor, recognized as reasonable ... and that [Dr. Mickelson] is not negligent if she goes with that method as long as she administered the method reasonably[.]
¶11 The Barneys objected, arguing that Dr. Mickelson did not employ an alternative method of treatment when she continuously monitored London's heart rate in the same way she started, namely by use of an external monitor. Thus, the Barneys argued, Dr. Mickelson effectively did nothing despite warning signs that the monitor was probably picking up Raquel's heart rate instead of London's heart rate.
¶12 Ultimately, the trial court gave the jury the alternative methods instruction, stating:
If you find from the evidence that more than one method of treatment for Raquel Barney's condition was recognized as reasonable in the state of medical knowledge at the time, then Dr. Mickelson was at liberty to select any of the recognized methods.
Dr. Mickelson was not negligent because she chose to use one of these recognized treatment methods rather than another recognized treatment method if she used reasonable care, skill, and judgment in administering the method.
¶13 The jury, with two dissenting jurors, found that Dr. Mickelson was not negligent with regard to her care and treatment of Raquel and London. The Barneys filed a motion after verdict seeking a new trial on the basis that the trial court erroneously instructed the jury on alternative methods. The Barneys argued that the instruction likely misled the jury because Dr. Mickelson did not actually employ an alternative method of treatment; rather, Dr. Mickelson did not take any action to definitely determine whether the external fetal monitor was tracing London or Raquel. The Barneys argued that there was no evidence presented that the external fetal monitor was an alternative method that could distinguish between maternal and fetal heart rates. The trial court denied the motion. This appeal follows.
DISCUSSION
¶14 On appeal, the Barneys reiterate their postverdict argument that the trial court erroneously issued the optional "alternative methods" instruction because the trial evidence did not support a finding that Dr. Mickelson actually employed an alternative method to differentiate between maternal and fetal heart rates. We agree.
¶15 "An appellate court will reverse and order a new trial if it finds that a challenged jury instruction, taken as a whole, was prejudicial in that it probably and not merely possibly misled the jury, or if it finds that the meaning communicated by the instruction as a whole was an incorrect statement of the law." Miller v. Kim , 191 Wis. 2d 187, 194, 528 N.W.2d 72 (Ct. App. 1995). " '[I]t is error for a court ... to give an instruction on an issue which finds no support in the evidence.' It is prejudicial error if an erroneous instruction probably and not merely possibly misleads the jury." Id. at 200 (citation omitted).
¶16 "The alternative method instruction is optional and should be given only when the evidence allows the jury to find that more than one method of diagnosis or treatment of the patient is recognized by the average practitioner." Finley v. Culligan , 201 Wis. 2d 611, 621-23, 548 N.W.2d 854 (Ct. App. 1996).
¶17 The Barneys contend that this case is analogous to Miller v. Kim , where the plaintiffs brought a medical malpractice action against a physician who failed to diagnose a child with spinal meningitis. Id. , 191 Wis. 2d at 192-93. In that case, all of the expert witnesses agreed that when the symptoms of spinal meningitis present in a young child, a spinal tap is the only diagnostic method available to definitively rule out the illness. Id. at 194-98. The Miller court rejected the doctor's argument that his individual observation was "an alternative diagnostic technique when the patient's symptoms present an 'index of suspicion' high enough to suggest meningitis." Id. at 197. Similarly, the Barneys argue that all of the medical experts in this case agreed that differentiation between maternal and fetal heart rates is crucial to determining fetal well-being and that the only way to definitively determine the difference is to employ either a pulse oximeter or a fetal scalp electrode.
¶18 Here, the issue is whether Dr. Mickelson negligently failed to recognize the difference between the maternal and fetal heart rates, and thus failed to recognize signs of fetal distress. The alternative methods instruction is misleading in this case because the instruction implies that as long as Dr. Mickelson employed a method of tracing London's heart rate she is absolved of negligence. However, the Miller court recognized that the alternative methods instruction is inappropriate where "the alleged negligence lies in failing to do something," as opposed to "negligently choosing between courses of action." Id. at 198 n.5. Simply put, "doing nothing" is not an alternative method of treatment or diagnosis. See id.
¶19 Applying Miller to the facts of this case, when there were signs that the external fetal monitor may not have been reliably tracing the fetal heart beat, Dr. Mickelson's "individualized observation," i.e., her continued reliance on the external fetal monitor, was not an acceptable "alternative diagnostic technique." Id. at 197. Dr. Mickelson administered neither a pulse oximeter nor a fetal scalp electrode. Thus, Dr. Mickelson's decision to "d[o] nothing" did not warrant the alternative methods instruction which, under the facts here, likely misled the jury. See id. at 198 n.5.
¶20 For the foregoing reasons, we reverse the trial court and remand for a new trial.
By the Court. -Order reversed and cause remanded with directions.
Not recommended for publication in the official reports.

A pulse oximeter is "[a] clip-like device called a probe [that] is placed on a body part, such as a finger or ear lobe. The probe uses light to measure how much oxygen is in the blood." See Pulse Oximetry , Johns Hopkins Med. Health Library , https://www.hopkinsmedicine.org/healthlibrary/test_procedures/pulmonary/pulse_oximetry_92,p07754 (last visited March 11, 2019).
A fetal scalp electrode is a "wire electrode [that] is attached to the fetal scalp or other body part through the cervical opening and is connected to [a] monitor." See External and Internal Monitoring of the Fetus , University of Rochester Med. Ctr. Health Encyclopedia , https://www.urmc.rochester.edu/encyclopedia/content.aspx?contenttypeid=92 & contentid=P07776 (last visited March 11, 2019).
The Barneys contend that a pulse oximeter in this case could have been attached to Raquel and compared to the fetal monitoring strips to determine whether the external monitor was monitoring Raquel or London.

External fetal heart monitoring "uses a device to listen to and record [a] baby's heartbeat through [the] belly (abdomen)." See Fetal Heart Monitoring , Johns Hopkins Med. Health Library , https://www.hopkinsmedicine.org/healthlibrary/test_procedures/gynecology/fetal_heart_monitoring_92,p07776 (last visited March 11, 2019). The monitor may be used to check the fetal heart rate during labor by fastening the monitor to the mother's abdomen. See id . The rate and pattern of the baby's heart rate are shown on a screen and printed on fetal monitoring strips. See id.