# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2017AP1616 |

| | |
|---|---|
| COMPLETE TITLE: | London Scott Barney, a minor, by David P. Lowe, his guardian ad litem and Raquel Barney, <br>     Plaintiffs-Appellants, <br>State of Wisconsin Department of Health and Family Services, <br>     Involuntary-Plaintiff, <br>United Health Care of Wisconsin, Inc., <br>     Intervenor, <br>   v. <br>Julie Mickelson, MD, Columbia St. Mary's Hospital Milwaukee, Inc. and Injured Patients and Families Compensation Fund, <br>     Defendants-Respondents-Petitioners. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 387 Wis. 2d 684,928 N.W.2d 799
(2019 – unpublished)

| | |
|---|---|
| OPINION FILED: | April 24, 2020 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | January 13, 2020 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| COURT: | Circuit |
| COUNTY: | Milwaukee |
| JUDGE: | Timothy M. Witkowiak |

| | |
|---|---|
| JUSTICES: | |

DALLET, J., delivered the majority opinion for a unanimous Court.

NOT PARTICIPATING:

ATTORNEYS:

For the defendants-respondents-petitioners Julie Mickelson, M.D. and Columbia St. Mary's Hospital Milwaukee, Inc., there were briefs filed by *James R. Gutglass, Bradley S. Foley, Jason M. Prekop* and *Gutglass, Erickson, Larson & Schneider, S.C.,* Milwaukee. There was an oral argument by *James R. Gutglass*.

For the defendant-respondent-petitioner Injured Patients and Families Compensation Fund, there were briefs filed by *Todd M. Weir, Jason J. Franckowiak* and *Otjen Law Firm, S.C.,* Waukesha. There was an oral argument by *Todd M. Weir*.

For the plaintiffs-appellants London Scott Barney and Raquel Barney, there was a brief filed by *Kent A. Tess-Mattner, Amy Hetzner* and *Schmidt, Rupke, Tess-Mattner & Fox, S.C.,* Brookfield. There was an oral argument by *Jeffrey M. Goldberg.*

NOTICE

This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.

No. 2017AP1616
 (L.C. No. 15CV3042)

STATE OF WISCONSIN      :      IN SUPREME COURT

**London Scott Barney, a minor, by David P. Lowe, his guardian ad litem and Raquel Barney,**

        **Plaintiffs-Appellants,**

**State of Wisconsin Department of Health and Family Services,**

        **Involuntary-Plaintiff,**

**United Health Care of Wisconsin, Inc.,**

        **Intervenor,**

        **v.**

**Julie Mickelson, MD, Columbia St. Mary's Hospital Milwaukee, Inc. and Injured Patients and Families Compensation Fund,**

        **Defendants-Respondents-Petitioners.**

**FILED**

**APR 24, 2020**

Sheila T. Reiff
Clerk of Supreme Court

DALLET, J., delivered the majority opinion for a unanimous Court.

REVIEW of a decision of the Court of Appeals. *Reversed.*

¶1 REBECCA FRANK DALLET, J. This case centers on whether, based on the evidence introduced at trial, a circuit court properly

instructed a jury on the "alternative methods" paragraph of Wis JI——Civil 1023 (2019) (the "alternative methods instruction").

¶2 London Barney was born with severe and permanent neurologic injuries. London and his mother, Raquel Barney, filed a medical malpractice action alleging that Dr. Julie Mickelson, M.D., was negligent for failing to accurately trace London's fetal heart rate during Mrs. Barney's labor. The Barneys alleged that without an accurate tracing of London's heart rate, Dr. Mickelson did not recognize signs that London's oxygenation status was depleting.

¶3 Over the Barneys' objection, the circuit court read the jury the alternative methods instruction. This instruction generally informed the jury that Dr. Mickelson was not negligent if she used reasonable care, skill, and judgment in administering any one of the recognized reasonable treatment methods for monitoring London's heart rate. The jury found Dr. Mickelson not negligent in her care and treatment of the Barneys.[1] The court of appeals reversed the judgment dismissing the Barneys' medical malpractice action and remanded the case for a new trial.[2]

¶4 We conclude that based on all of the expert testimony introduced at trial, the jury was properly given the alternative methods instruction in this case. Therefore, we reverse the court of appeals and uphold the jury verdict.

---

[1] The Honorable Timothy Witkowiak of the Milwaukee County Circuit Court presided.

[2] Barney v. Mickelson, No. 2017AP1616, unpublished slip op., ¶18 (Wis. Ct. App. Apr. 16, 2019).

2

I.  FACTUAL BACKGROUND AND PROCEDURAL POSTURE

¶5    Mrs. Barney was admitted to Columbia St. Mary's Hospital in Milwaukee on February 15, 2012, to induce labor and deliver her son, London.  Throughout Mrs. Barney's labor, Dr. Mickelson and the care team utilized an external monitor, attached to Mrs. Barney's abdomen, to record and report London's heart rate.[3]  Dr. Mickelson delivered London on February 16, 2012.  London was born blue, nonresponsive, and exhibited limited muscle movements.  London was resuscitated, but sustained permanent and severe neurologic injuries.

¶6    The Barneys filed a medical malpractice suit against Dr. Mickelson, Columbia St. Mary's Hospital, and the Injured Patients and Families Compensation Fund (collectively, the Defendants), alleging that Dr. Mickelson and her staff failed to recognize and properly respond to signs of fetal oxygen deprivation, and that this failure caused London to suffer severe and permanent neurologic injuries.  The case proceeded to a three-week jury trial that included the testimony of 16 expert witnesses.

---

[3] There is no dispute about what an external monitor does. However, we provide some background for the benefit of the reader. An external monitor is a device to listen to and record a fetal heart rate through the mother's abdomen.  See https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/fetal-heart-monitoring.  The rate and pattern of the baby's heart rate is shown on a screen and printed on paper on "external monitor strips."  Id.

¶7   As relevant to this appeal,[4] the Barneys maintained that 90 minutes prior to delivery, at the critical pushing stage, Dr. Mickelson was negligent in failing to switch to a more accurate method of monitoring London's heart rate, which would have revealed London's lack of adequate oxygenation.[5]  The Barneys' standard of care expert, Dr. Bruce Bryan, testified that the external monitor was not accurately tracing London's heart rate 90 minutes prior to delivery, and therefore Dr. Mickelson should have switched to a pulse oximeter or a fetal scalp electrode to trace the fetal heart rate.[6]

¶8   Dr. Mickelson testified that she believed that the external monitor was accurately tracing London's heart rate.  Dr. Mickelson's two standard of care experts, Dr. Dennis Worthington and Dr. Sean Blackwell, opined that the external monitor was

---

[4] Although a total of 16 experts testified at trial, the issue raised in this appeal involves the testimony of the three standard of care experts and Dr. Mickelson.

[5] The parties do not dispute that information about the rate and pattern of the fetal heart rate during labor helps the care team to assess fetal well-being and oxygenation levels.

[6] As background for the reader:  a pulse oximeter is "[a] clip-like device called a probe [that] is placed on a body part, such as a finger or ear lobe.  The probe uses light to measure how much oxygen is in the blood." https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/pulse-oximetry.

A fetal scalp electrode is a "wire electrode [that] is attached to the fetal scalp or other body part through the cervical opening and is connected to [a] monitor." https://www.urmc.rochester.edu/encyclopedia/content.aspx?content typeid=92&contentid=P07776.

accurately monitoring London's heart rate, and that it was reasonable for Dr. Mickelson to continue using the external monitor throughout the delivery, rather than switching to a pulse oximeter or fetal scalp electrode.

¶9 Prior to trial, and again at the jury instruction conference, the Defendants requested that the circuit court give the alternative methods instruction, which reads:

> If you find from the evidence that more than one method of (treatment for) (diagnosing) (plaintiff)'s (injuries) (condition) was recognized as reasonable given the state of medical knowledge at that time, then (doctor) was at liberty to select any of the recognized methods. (Doctor) was not negligent because (he) (she) chose to use one of these recognized (treatment) (diagnostic) methods rather than another recognized method if (he) (she) used reasonable care, skill, and judgment in administering the method.

Wis JI——Civil 1023.[7] The Defendants argued that the instruction was warranted based on testimony that the continued use of the external monitor was recognized as a reasonable method of treatment. The Barneys objected to the instruction, arguing that Dr. Mickelson's continued reliance on the external monitor, as opposed to switching to the pulse oximeter or fetal scalp electrode, was effectively "doing nothing," which was not an alternative method.

¶10 The circuit court agreed with the Defendants and gave the jury the following alternative methods instruction:

---

[7] The alternative methods instruction is an optional paragraph contained in the medical malpractice jury instruction, Wis JI——Civil 1023.

5

> If you find from the evidence that more than one method of treatment for Raquel Barney's condition was recognized as reasonable in the state of medical knowledge at the time, then Dr. Mickelson was at liberty to select any of the recognized methods. Dr. Mickelson was not negligent because she chose to use one of these recognized treatment methods rather than another recognized treatment method if she used reasonable care, skill, and judgment in administering the method.

The jury, with two jurors dissenting, found Dr. Mickelson not negligent in her care and treatment of the Barneys.[8]

¶11 The Barneys filed a motion after verdict for a new trial pursuant to Wis. Stat. § 805.15(1) (2017-18)[9] on the basis that the circuit court erroneously gave the alternative methods instruction. The Barneys asserted that the instruction misled the jury because Dr. Mickelson did not actually employ one of the alternative methods of treatment. The circuit court denied the motion.

¶12 The court of appeals, relying on Miller v. Kim, 191 Wis. 2d 187, 528 N.W.2d 72 (Ct. App. 1995), concluded that Dr. Mickelson's continued reliance on the external monitor was "not an acceptable 'alternative diagnostic technique'" and her failure to switch to a pulse oximeter or fetal scalp electrode was, instead, a decision to "do nothing." Barney v. Mickelson, No. 2017AP1616, unpublished slip op., ¶19 (Wis. Ct. App. Apr. 16, 2019). Since the alternative methods instruction "likely misled

---

[8] The jury also found that Dr. Mickelson was not negligent with respect to her informed consent obligations. That issue is not before us on appeal.

[9] All subsequent references to the Wisconsin Statutes are to the 2017-18 version unless otherwise indicated.

the jury," the court of appeals remanded the case for a new trial. Id., ¶¶19-20.

¶13 The Defendants petitioned this court for review, which we granted.

## II. STANDARD OF REVIEW

¶14 It is well established that a circuit court has broad discretion when instructing a jury. See, e.g., White v. Leeder, 149 Wis. 2d 948, 954, 440 N.W.2d 557 (1989). We review the jury instructions to determine whether, as a whole, they adequately and properly communicated to the jury a correct statement of the law. See Nowatske v. Osterloh, 198 Wis. 2d 419, 428-29, 543 N.W.2d 265 (1996), abrogated on other grounds by Nommensen v. Am. Cont'l Ins. Co., 2001 WI 112, 246 Wis. 2d 132, 629 N.W.2d 301. If a jury instruction is determined to be erroneous, we reverse and remand for a new trial only if the error was prejudicial. See Kochanski v. Speedway SuperAmerica, LLC, 2014 WI 72, ¶11, 356 Wis. 2d 1, 850 N.W.2d 160. "An error is prejudicial when it probably misled the jury." Id.

## III. ANALYSIS

¶15 This court has upheld substantially the same alternative methods instruction as a correct statement of the law. Nowatske, 198 Wis. 2d at 446-49. The opening sentence of the instruction "insures that it is for the jury, exercising its role as fact-finder, to determine whether there is more than one method of treatment as well as whether the treatment method chosen is among

those methods recognized as acceptable." Id. at 447.[10] The instruction is optional and to be given "only when the evidence allows the jury to find that more than one method of diagnosis or treatment of the patient is recognized by the average practitioner." Finley v. Culligan, 201 Wis. 2d 611, 622, 548 N.W.2d 854 (Ct. App. 1996) (citing Miller, 191 Wis. 2d at 198).

¶16 In Miller, the court of appeals recognized that the alternative methods instruction is inappropriate in cases where the alleged negligence "lies in failing to do something, not in negligently choosing between courses of action." 191 Wis. 2d at 198 n.5. Our task is to determine whether the alternative methods instruction was erroneously given to the jury based on the record in this case and in light of Miller.

¶17 We first review the trial testimony of Dr. Mickelson and the parties' standard of care experts——Dr. Bryan, Dr. Worthington,

---

[10] Nowatske v. Osterloh, 198 Wis. 2d 419, 543 N.W.2d 265 (1996), abrogated on other grounds by Nommensen v. American Continental Insurance Co., 2001 WI 112, 246 Wis. 2d 132, 629 N.W.2d 301, primarily dealt with the final sentence of the alternative methods instruction, which was subsequently removed. The Nowatske court reasoned that the instruction would be clearer if:

> its final sentence were eliminated or if the paragraph stated explicitly that the jury alone determines which methods of treatment are "recognized" on the basis of the expert testimony in evidence. But these suggested revisions do not alter our conclusion that the third paragraph adequately instructed the jury regarding its prerogative to assess and weigh the evidence before it in reaching a verdict.

Id. at 448-49.

and Dr. Blackwell——to ascertain the reasonable methods of treatment available to monitor London's heart rate.  We then consider whether the court of appeals correctly relied upon Miller to conclude that Dr. Mickelson in fact "did nothing," rendering the alternative methods instruction inappropriate.

A. The Contested Expert Testimony at Trial

¶18  The Barneys' case depends upon the conclusion that Dr. Mickelson's continued use of an external monitor was not among the reasonable alternative methods of treatment to continuously and accurately measure London's heart rate.  A review of the record shows that the parties' experts disputed whether the external monitor was continuously and accurately measuring London's heart rate in the last 90 minutes of labor and, consequently, whether Dr. Mickelson's use of the external monitor continued to be a reasonable alternative method.

¶19  The experts disputed the extent to which, in the last 90 minutes of labor, the external monitor missed London's heart rate or traced Mrs. Barney's heart rate instead.  Dr. Blackwell, one of Dr. Mickelson's experts, testified that "[m]y interpretation is the bulk of the continuous tracing is fetal," meaning the external monitor was predominantly monitoring London's heart rate.  While Dr. Blackwell admitted that "it is a known phenomenon that a monitor can misinterpret a fetal heart and a maternal heart sometimes," he testified:

> I don't believe that it happened here.  As I continuously watch the tracing, as we saw, we've seen hours and hours of tracing, a baby's heart rate like our heart rate changes quite a bit based on what's going on.  I just

9

don't see those - - I don't over-interpret some of those isolated findings. You have to look at the overall continuous pattern.

¶20 Additionally, in responding to the contention that for substantial periods of time the fetal heart rate was being missed and instead the maternal heart rate was being traced, Dr. Blackwell said the following:

> [Defense counsel]: Was there any reasonable possibility, in your opinion, that for substantial periods of time the real fetal tracing was being missed and maternal was being traced, and you were missing the status of this fetus during this labor?
>
> [Dr. Blackwell]: Other than the period of the epidural, I'd say no.[11]

In Dr. Blackwell's view, when all of the external monitor strips were read together, and in context, there was nothing to suggest that London's heart rate was being missed.

¶21 Dr. Worthington, another one of Dr. Mickelson's experts, testified that it was fairly easy to distinguish the fetal heart rate from the maternal heart rate on the external monitor strips.[12] Dr. Mickelson herself testified that she "could rule out that the entire tracing was the maternal" and that she was "confident that

---

[11] The epidural was given to Mrs. Barney 12 hours prior to London's delivery.

[12] The Barneys assert that Dr. Worthington's deposition testimony was different than his trial testimony in regard to whether the tracings on the external monitor were fetal or maternal. However, this inconsistency was raised at trial and we defer to a jury's credibility determinations. See Meurer v. ITT Gen. Controls, 90 Wis. 2d 438, 450, 280 N.W.2d 156 (1979) ("The credibility of witnesses and the weight given to their testimony are left to the judgment of the jury . . . .").

10

the majority of the tracing except for a few small spots was the baby . . . ."

¶22  The Barneys' expert, Dr. Bryan, was the only expert to testify that there was a concerning "discontinuity" in the tracings by the external monitor and indications that the monitor was tracing the maternal heart rate rather than the fetal heart rate, which should have prompted action by Dr. Mickelson.[13]  Dr. Bryan testified that, starting in the morning on February 16th, there was discontinuity in the external monitor readings, which meant that Dr. Mickelson could not accurately assess fetal well-being. However, he admitted that the failure to switch to an alternative earlier in the day did not cause London any harm and that the previous fetal tracings had been "decent."[14]  He ultimately opined

---

[13] It was undisputed at trial that there were periods of time where the external monitor showed discontinuity.  All of the experts agreed that this was not automatically concerning, as it was common to see this discontinuity or "drop out" during maternal movement or repositioning.  Dr. Bryan testified as follows:

[Defense counsel]:  So you agree that every time there's a difficult read or a sketchy tracing, the standard of care does not require putting in an internal scalp electrode, true?

[Dr. Bryan]:  That's correct.

[14] Dr. Bryan was asked the following questions:

[Defense counsel]:  The fact that there was no fetal scalp electrode on through 17:21, 5:21 for us civilians, did not cause any harm, true?

[Dr. Bryan]:  True.

[Defense counsel]:  And we even extended it further at your deposition, did we not?

[Dr. Bryan]:  Yes.

that, at the very least, Dr. Mickelson missed signs of fetal distress by not having an accurate fetal heart rate reading in the 90 minutes prior to London's delivery.

¶23 The experts further disputed whether, in the last 90 minutes of labor, Dr. Mickelson's continued use of the external monitor to measure London's heart rate was a reasonable alternative method to the use of a pulse oximeter or fetal scalp electrode to monitor fetal heart rate. Dr. Bryan was the only expert to testify that since the external monitor was not accurately tracing London's heart rate, Dr. Mickelson had to switch to one of two methods to more accurately monitor the fetal heart rate and fetal well-being: a pulse oximeter or a fetal scalp electrode.

¶24 Dr. Mickelson's experts did not dispute that the pulse oximeter and fetal scalp electrode were reasonable alternatives to monitor fetal heart rate.[15] However, they testified that those alternatives were not necessary in this case because continuing

---

[Defense counsel]: You said that the baby was fine, and you've said that today through 18:10 or 6:10 . . . .

[Dr. Bryan]: I remember that. That's what I said.

[Defense counsel]: Okay. So as of 18:10 or 6:10, the fact that a fetal scalp electrode had not been placed did not cause any harm, true?

[Dr. Bryan]: True.

[15] Dr. Blackwell and Dr. Mickelson both voiced concern that Mrs. Barney's infection could have spread to London if a fetal scalp electrode had been attached.

12

with an external monitor was a reasonable alternative that fell within the standard of care.  Dr. Worthington testified:

> [Defense counsel]:  Let me ask you this, if you have brief switches from fetal to maternal or drop-out due to position change, is it required by the standard of care to switch your monitoring of an infected mother to the invasive scalp electrode from what had been working with the external monitor?
>
> [Dr. Worthington]:  I think if you feel comfortable with your recording and can interpret the fetal heart rate, there's no reason to switch.

¶25  Dr. Blackwell similarly testified that "the most common and the most reasonable thing, if your tracings have been good before then, is to continue to watch the tracing" and that it was "very reasonable to continue to follow and watch" in this case. He further testified on this point:

> [Plaintiff's counsel]:  Am I correct, Doctor, that all they had to do to confirm whether they were really watching London or watching [Mrs. Barney] was take [Mrs. Barney's] pulse during a contraction and see how that compared to the rate -- the rate that's being traced. That is one way, correct?
>
> [Dr. Blackwell]:  That is one way.  There are other ways. That is one way.
>
> [Plaintiff's counsel]:  And the other way is to put on a pulse oximeter?
>
> [Dr. Blackwell]:  That is another way, and another way is to watch the continuous fetal heart rate tracing.
>
> [Plaintiff's counsel]:  No, Doctor.  Watching it continuously may not tell you whether you're really watching mom or watching baby, correct?

13

[Dr. Blackwell]: I believe that it did, and I believe it can, and I believe it's within the standard of care.[16]

¶26 Dr. Worthington also answered a question that precisely tracked the language in the alternative methods instruction:

[Defense counsel]: One final question. Was utilizing an external monitor a recognized alternative method to monitor this fetus?

[Dr. Worthington]: Yes.

[Defense counsel]: And in administrating and applying that method of the external monitor, did Dr. Mickelson use reasonable care, skill, and judgment in administering that method?

[Dr. Worthington]: Yes.

¶27 The trial testimony demonstrates that the experts disputed whether the external monitor was continuously and accurately tracing London's heart rate. Further, there was a dispute about whether continuing with the external monitor in the last 90 minutes of Mrs. Barney's labor was a reasonable alternative to a pulse oximeter or a fetal scalp electrode. Since there was substantial testimony that Dr. Mickelson's continued use of the external monitor was a reasonable method to continue to assess London's heart rate and was within the standard of care, the alternative methods instruction was properly given by the circuit court in this case.

B. <u>Miller v. Kim</u>

---

[16] In addition, Dr. Blackwell testified that the placement of a scalp electrode, the Barneys' other proffered alternative, was not necessary in order to meet the standard of care.

¶28 Both the court of appeals and the Barneys maintain that Dr. Mickelson's decision to continue with the external monitor was a decision to "do nothing" that rendered the alternative methods instruction improper, pursuant to the court of appeals' decision in Miller. In Miller, a jury found that a doctor was not negligent in his failure to perform a spinal tap on an infant who subsequently suffered permanent brain damage from undiagnosed meningitis. 191 Wis. 2d 187. The Millers contended that the circuit court committed prejudicial error when it gave the alternative methods instruction because all of the experts testified that a spinal tap is the only reasonable method of diagnosis for a young child with symptoms of spinal meningitis. Id. at 191.

¶29 The court of appeals concluded that the circuit court erred when it gave the alternative methods instruction because the doctor's claim that "individualized observation" was "an alternative diagnostic technique" did not conform with the unanimous expert testimony presented at trial. Id. The court reasoned:

> [t]he "alternative method" instruction is optional and is only to be given by the trial court when the evidence allows the jury to find that more than one method of treatment of the patient is recognized by the average practitioner. The trial court's amendment of the pattern instruction would have been appropriate had there been medical expert testimony that there were available to the average practitioner alternative methods of diagnosing [the child's] spinal meningitis.

15

Id. at 198.  Because the alternative methods instruction probably misled the jury, the court remanded the case for a new trial.  Id. at 190.

¶30  To fit this case into the Miller framework, the court of appeals ignored the testimony of Dr. Mickelson's experts as to alternative methods.[17]  The court focused solely on Dr. Bryan's testimony and reasoned that since "there were signs that the external fetal monitor may not have been reliably tracing the fetal heart beat," Dr. Mickelson's "continued reliance on the external fetal monitor, was not an acceptable 'alternative diagnostic technique.'"  Barney, No. 2017AP1616, ¶19 (quoted source omitted).

¶31  However, as discussed above, the experts in this case disputed whether the external monitor failed to accurately monitor London's heart rate in the last 90 minutes of labor.  Unlike Miller, where the experts were unanimous that only one diagnostic method existed, this record contained substantial expert testimony

---

[17] Dr. Mickelson asks us to overrule Miller v. Kim, 191 Wis. 2d 187, 528 N.W.2d 72 (Ct. App. 1995), because "its analysis and reasoning allows Courts to engage in critical fact finding that should be left to the jury."  On several occasions, Wisconsin courts have reviewed the applicability of the alternative methods instruction and a plaintiff's assertion that their case was akin to Miller.  See, e.g., Weborg v. Jenny, No. 2010AP258, unpublished slip op., ¶20 ("However, here, unlike Miller, there was evidence of alternatives."); Finley v. Culligan, 201 Wis. 2d 611, 625-26, 548 N.W.2d 854 (Ct. App. 1996) ("Thus, this case is not like Miller because this is not a case where all of the experts, including the defense experts, testified at some point that performing a biopsy was the only way to definitively diagnose a solid tumor as being cancerous.").  Similarly, the facts in this case are distinguishable from Miller and therefore, overruling Miller is unwarranted and unnecessary.

on which the jury could find that Dr. Mickelson's choice to continue with the external monitor was a reasonable alternative method of monitoring London's heart rate and was not analogous to "doing nothing."  Therefore, we conclude that there is ample evidence in this record to support the circuit court's decision to give the alternative methods instruction.  See Lutz v. Shelby Mut. Ins. Co., 70 Wis. 2d 743, 750, 235 N.W.2d 426 (1975) ("It is error for a court [] to refuse to instruct on an issue which is raised by the evidence . . . ."); see also Aetna Cas. & Sur. Co. v. Osborne-McMillan Elevator Co., 26 Wis. 2d 292, 305, 132 N.W.2d 51 (1965) ("Where there is a conflict in the evidence and inconsistent theories on the cause of the event are advanced, we believe instructions encompassing both theories should be given.").

¶32  It is important to remember that "[i]t is the function of the trier of fact, and not of an appellate court, to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." State v. Poellinger, 153 Wis. 2d 493, 506, 451 N.W.2d 752 (1990) (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979)).  Any dispute in testimony regarding the complex medical issues in this case was for the jury, not the court of appeals or this court, to weigh and ultimately resolve.  Based on all of the expert testimony presented at trial, the circuit court properly gave the jury the alternative methods instruction.

## IV.  CONCLUSION

¶33 We conclude that the jury was properly given the alternative methods instruction in this case based on the expert

17

testimony introduced at trial.  Therefore, we reverse the court of appeals decision and reinstate the judgment dismissing the Barneys' claim against the Defendants.

*By the Court.*— The decision of the court of appeals is reversed.

1