COURT OF APPEALS
DECISION
DATED AND FILED

June 23, 2020

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No.     **2019AP1062**

**STATE OF WISCONSIN**

Cir. Ct. No.  2015CV1636

**IN COURT OF APPEALS
DISTRICT III**

MICHAEL J. SUHS AND MEGAN SUHS, A MINOR, BY HER GUARDIAN AD LITEM, J. MICHAEL END,

   PLAINTIFFS-APPELLANTS,

 V.

PROASSURANCE CASUALTY COMPANY, MARK A. GARDON, M.D., BAYCARE CLINIC, LLP - NEUROLOGICAL SURGEONS AND INJURED PATIENTS AND FAMILIES COMPENSATION FUND,

   DEFENDANTS-RESPONDENTS.

        APPEAL from an order of the circuit court for Brown County: KENDALL M. KELLEY, Judge. *Affirmed*.

        Before Stark, P.J., Hruz and Seidl, JJ.

        **Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1    PER CURIAM.   Michael Suhs and his minor daughter, Megan Suhs, (collectively, "Suhs") appeal an order dismissing their medical negligence and loss of society and companionship claims against Mark A. Gardon, M.D., Proassurance Casualty Company, Baycare Clinic, LLP - Neurological Surgeons, and the Injured Patients and Families Compensation Fund (collectively, "Gardon").  Following the close of Suhs' evidence at a jury trial, the circuit court granted Gardon's motion to dismiss under WIS. STAT. § 805.14(3) (2017-18),[1] concluding Suhs had failed to present sufficient evidence to prevail on his medical negligence claim.  We conclude the court properly granted Gardon's motion to dismiss because Suhs failed to present sufficient evidence to allow the jury to determine what, if any, damages Suhs sustained as a result of Gardon's alleged negligence.  We therefore affirm the order dismissing Suhs' claims.[2]

---

[1] All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

[2] It is undisputed that, if the circuit court properly dismissed Suhs' medical negligence claim, it also properly dismissed his daughter's loss of society and companionship claim, which was derivative of the medical negligence claim.  As a result, we do not separately address the loss of society and companionship claim in this opinion.

In addition to arguing that the circuit court erred by granting Gardon's motion to dismiss, Suhs argues that the court erred by precluding him from introducing certain medical bills without expert testimony.  Suhs concedes, however, that we need not address that issue unless we reverse the court's decision on Gardon's motion to dismiss.

Suhs also argues that the circuit court erred by preventing him from introducing evidence that Gardon ordered a consult for an epidural steroid injection.  In response, Gardon asserts that issue is moot if we affirm the court's decision to dismiss Suhs' claims.  Suhs does not respond to Gardon's mootness argument in his reply brief, and we therefore deem the point conceded. *See Charolais Breeding Ranches, Ltd. v. FPC Sec. Corp.*, 90 Wis. 2d 97, 109, 279 N.W.2d 493 (Ct. App. 1979).

Finally, Gardon argues he was also entitled to dismissal of Suhs' claims on other, independent grounds—namely, the "respectable minority of physicians doctrine."  Because we conclude the circuit court properly dismissed Suhs' claims based on Suhs' failure to present sufficient evidence regarding causation and damages, we need not address Gardon's argument regarding the "respectable minority of physicians doctrine."

## BACKGROUND

¶2    On January 5, 2013, Suhs presented at the Bay Area Medical Center complaining of severe low back pain.  An emergency department physician prescribed medication and sent Suhs home.  As of January 6, Suhs still had low back pain but felt "all right."  At about 1:00 a.m. on January 7, however, Suhs was experiencing increased pain, and when he stood up from his kitchen table, his legs gave out.  He subsequently noticed that he had urinated on himself.  He then called his girlfriend, who drove him back to the emergency department at the Bay Area Medical Center.

¶3    Suhs arrived at the emergency department at 1:42 a.m. on January 7, suffering from weakness, numbness in his lower extremities, reduced reflexes, urinary retention with dribbling, and sensory loss in his "saddle" area (i.e., his buttocks and groin).  An emergency department physician determined Suhs' symptoms were consistent with a diagnosis of cauda equina syndrome.  At trial, Suhs' neurosurgery expert, Dr. Frederick Brown, explained that cauda equina syndrome "is a clinical syndrome associated with pressure or choking of the cauda equina," which is a group of nerves "coming off the spinal cord" that "supply lower extremity strength, legs, ankles, bowel, bladder, [and] sexual function."  Brown further testified that the symptoms of cauda equina syndrome include "sciatic-like pain, loss of bladder function, bowel function, sexual function, lower extremity weakness, [and] lower extremity numbness."

¶4    Following his diagnosis, Suhs was transferred to the Aurora BayCare Medical Center in Green Bay.  Once there, an emergency department physician ordered an MRI, which showed that a synovial cyst was compressing Suhs' cauda equina at the L4-L5 level.  Following the MRI, Suhs was referred to Gardon, a

neurosurgeon who had performed a spinal fusion surgery on Suhs at the L5-S1 level in 2004. Gardon reviewed Suhs' MRI and saw Suhs shortly after noon on January 7. He recognized that Suhs was suffering from cauda equina syndrome.

¶5 The treatment for cauda equina syndrome is surgical decompression. After reviewing Suhs' MRI on January 7, Gardon decided to consult Suhs' chart from the 2004 fusion surgery to confirm the type of screws and rods that were used in that procedure so that he could have the necessary tools available to remove or add to that instrumentation, if necessary, during Suhs' decompression surgery. The chart from the 2004 procedure was not available electronically, so Gardon had to request it from an off-site storage facility.

¶6 After seeing Suhs, Gardon consulted a book authored by neurosurgeon Mark Greenberg to determine the appropriate time frame for performing the decompression surgery. Evidence at trial showed that Greenberg's book states, in relevant part:

> Timing of diskectomy in cauda equina syndrome [is] controversial and the point of contention in numerous lawsuits. In spite of early reports emphasizing rapid decompression, other reports found no correlation between the time to surgery after presentation and return of function. Some evidence supports the goal of performing surgery within 48 hours, although performing surgery within 24 hours is desirable if possible. There is no statistically significant proof that delaying up to 48 hours is detrimental.

Based on Greenberg's book, Gardon determined Suhs' decompression surgery should be performed within forty-eight hours of the onset of Suhs' symptoms—in other words, within forty-eight hours of 1:00 a.m. on January 7. At 1:45 p.m. on January 7, Gardon scheduled Suhs' surgery for 7:30 the following morning—which was approximately 30.5 hours after the onset of his symptoms.

¶7    Gardon performed Suhs' decompression surgery as scheduled on January 8. On January 11, Suhs was transferred to the rehabilitation portion of Aurora BayCare, where he remained for approximately eighteen days. Following his discharge, Suhs continued his rehabilitation on an outpatient basis. Suhs' bladder function and sexual function ultimately improved to some degree, and he is able to walk, albeit with some deficit in his right lower extremity. Suhs' condition did not improve completely, however, and he continues to have problems with mobility, bowel and bladder function, pain, numbness, sleep, anxiety, and sexual function.

¶8    Suhs filed the instant medical malpractice lawsuit against Gardon in November 2015. The case proceeded to a trial, during which Brown (Suhs' neurosurgery expert) testified that the standard of care required Gardon to perform Suhs' decompression surgery "as soon as feasible" and "as quickly as possible." More specifically, Brown testified that the standard of care required Gardon to perform the surgery on January 7, 2013, and that Gardon breached the standard of care by failing to do so. Brown acknowledged, however, that he could not identify a specific time by which Gardon should have operated to prevent Suhs from suffering any permanent neurological deficits.

¶9    Brown also admitted during his testimony that cauda equina syndrome patients, like Suhs, who are already experiencing saddle anesthesia at the time of presentation tend to have permanent deficits. In addition, he conceded that he had operated on twenty to thirty cauda equina syndrome patients during his career, all within twenty-four hours of the onset of symptoms, and some of those patients had nevertheless suffered permanent deficits, such as bowel and bladder problems and foot drop.

¶10     Brown further acknowledged that Suhs' condition had improved to some degree following the decompression surgery. He opined, however, that Suhs would have had a "better outcome" if Gardon had operated on January 7, rather than on January 8. When asked to specify what that "better outcome" would have been, Brown testified Suhs "would be more likely than not to have better bowel, bladder, sexual, and lower extremity motor function, as well as less numbness and neuropathic pain."

¶11     Gardon filed a motion to dismiss at the close of Suhs' evidence under WIS. STAT. § 805.14(3), arguing Suhs had not presented sufficient evidence to prevail on his medical negligence claim. The circuit court agreed and granted Gardon's motion. With respect to the standard of care, the court found that Suhs had failed to provide any credible evidence as to when the standard of care required Gardon to perform Suhs' decompression surgery. The court also found that Suhs had failed to provide sufficient evidence that Gardon's alleged negligence had caused Suhs any damages and, if so, in what amount. The court concluded Brown's testimony that Suhs would have been "better" had the surgery been performed earlier did not provide a basis for the jury to determine the nature and extent of any damages caused by Gardon's negligence, and the jury therefore would have been required to speculate in order to resolve those issues. The court subsequently entered a written order for judgment in favor of Gardon, and Suhs now appeals.

**DISCUSSION**

¶12     WISCONSIN STAT. § 805.14(3) permits a defendant to move for dismissal at the close of the plaintiff's evidence "on the ground of insufficiency of evidence." A court may grant such a motion only if it is satisfied that, "considering all credible evidence and reasonable inferences therefrom in the light most favorable

to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party." Sec. 805.14(1).

¶13 On appeal, we will not reverse a circuit court's decision to dismiss for insufficient evidence unless the record reveals that the court was "clearly wrong." *Weiss v. United Fire & Cas. Co.*, 197 Wis. 2d 365, 389, 541 N.W.2d 753 (1995). Moreover, because a circuit court is better positioned than this court to decide the weight and relevancy of the testimony, we must give substantial deference to the circuit court's better ability to assess the evidence. *Id.* at 388-89. In addition, when considering whether a plaintiff produced sufficient evidence to support his or her claim, it is critical to note that a jury's verdict "cannot be permitted to rest upon speculation or conjecture." *Schulz v. St. Mary's Hosp.*, 81 Wis. 2d 638, 658, 260 N.W.2d 783 (1978) (citation omitted).

¶14 In order to prevail on a medical negligence claim, a plaintiff must establish four elements: "(1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶17, 242 Wis. 2d 507, 625 N.W.2d 860. In other words, the plaintiff must establish "a negligent act or omission that causes an injury." *Id.*

¶15 Here, the circuit court concluded Suhs had not presented sufficient evidence to support jury findings in his favor on any of the elements of his medical negligence claim. On appeal, we assume without deciding that Suhs submitted sufficient evidence regarding Gardon's breach of a duty owed to Suhs.[3] We

---

[3] Because we assume without deciding that Suhs submitted sufficient evidence regarding Gardon's breach of a duty owed to Suhs, we need not address the parties' arguments regarding *Barney v. Mickelson*, 2020 WI 40, 391 Wis. 2d 212, 942 N.W.2d 891, and whether Gardon's decision to perform Suhs' decompression surgery on January 8 rather than January 7 was a reasonable alternative method of treatment.

conclude, however, that the court properly dismissed Suhs' claims because Suhs did not submit any credible evidence as to what damages, if any, he sustained as a result of Gardon's alleged negligence.

¶16 A medical malpractice defendant may not be held liable unless the plaintiff's damages were "caused by the [defendant's] failure to conform to the accepted standard of care." **Dettmann v. Flanary**, 86 Wis. 2d 728, 737, 273 N.W.2d 348 (1979) (citation omitted). "To establish causation in Wisconsin, the plaintiff bears the burden of proving that the defendant's negligence was a substantial factor in causing the plaintiff's harm." **Ehlinger v. Sipes**, 155 Wis. 2d 1, 12, 454 N.W.2d 754 (1990). Moreover, the evidence must be sufficient "to enable the jury to measure the loss sustained." **Schulz**, 81 Wis. 2d at 656. "The burden is on the plaintiff to establish to a reasonable certainty the damages sustained. The jury is not allowed to speculate." **Id.** (citation omitted).

¶17 In this case, Suhs relied on Brown's expert testimony to establish that Gardon's alleged negligence—i.e., his decision to perform the decompression surgery on January 8 rather than January 7—caused Suhs to sustain damages. Brown merely testified, however, that Suhs would have had a "better outcome" had Gardon performed surgery on January 7. When asked to explain what that "better outcome" would have been, Brown simply stated that Suhs would have had "better bowel, bladder, sexual, and lower extremity motor function, as well as less numbness and neuropathic pain." Brown did not offer any opinion as to how much better any of those symptoms would have been had Gardon performed surgery on January 7. Moreover, Brown did not opine that Suhs would have had no permanent deficits had the surgery been performed sooner.

¶18 To the contrary, Brown admitted that cauda equina syndrome patients, like Suhs, who are already experiencing saddle anesthesia at the time of presentation tend to have permanent deficits. Brown also conceded that even though he had operated on each of his twenty to thirty cauda equina syndrome patients within twenty-four hours of the onset of their symptoms, some of those patients had nevertheless suffered permanent deficits, such as bowel and bladder problems and foot drop. In addition, Brown acknowledged that Suhs' condition had improved to some extent following the January 8 decompression surgery.

¶19 On this evidence, there was no basis for the jury to determine what, if any, damages Suhs sustained as a result of Gardon's alleged negligence. Stated differently, Brown's testimony did not provide a way for the jury to determine—even by means of a reasonable inference—what harm, if any, was caused by Gardon's failure to operate sooner, and what harm would have occurred regardless of when the surgery was performed, simply because Suhs was suffering from cauda equina syndrome. Thus, in order to make that determination, the jury would have been forced to resort to speculation.

¶20 The applicable jury instruction on medical negligence, WIS JI—CIVIL 1023, helps to illustrate the insufficiency of Brown's testimony. Had the case been submitted to the jury, the circuit court would have instructed the jurors as follows:

> The evidence indicates without dispute that when Suhs retained the services of Gardon and placed himself under Gardon's care, Suhs was suffering from some illness or disease. Suhs' then physical condition cannot be regarded by you in any way as having been caused or contributed to by any negligence on the part of Gardon. This question asks you to determine whether the condition of Suhs' health, as it was when Suhs placed himself under the doctor's care, has been aggravated or further impaired as a natural result of the negligence of Gardon's treatment.

> Suhs sustained injuries before the treatment by Gardon. Such injuries have caused (and could in the future cause) Suhs to endure pain and suffering and incur some disability. In answering these questions on damages, you will entirely exclude from your consideration all damages which resulted from the original injury; you will consider only the damages Suhs sustained as a result of the treatment by Gardon.
>
> It will, therefore, be necessary for you to distinguish and separate, first, the natural results in damages that flow from Suhs' original illness and, second, those that flow from Gardon's treatment and allow Suhs only the damages that naturally resulted from the treatment by Gardon.

*Id.* (edited to reflect the parties' names and the circumstances of this case). Thus, the court would have informed the jury that it was required to distinguish between any damages Suhs sustained as a result of Gardon's treatment (including any delay in his conducting the decompression surgery) and any damages he sustained as a natural result of his cauda equina syndrome, and that it could only award the former category of damages. Brown's testimony did not provide a sufficient basis for the jury to draw that distinction.

¶21     Moreover, the jury instruction on the burden of proof would have informed the jury that Suhs had the burden to prove his case "by the greater weight of the credible evidence, to a reasonable certainty." WIS JI—CIVIL 200. The instruction continues: "'Reasonable certainty' means that you are persuaded based upon a rational consideration of the evidence. Absolute certainty is not required, but a guess is not enough to meet the burden of proof." *Id.* For the reasons explained above, Brown's testimony in this case was insufficient to give rise to "reasonable certainty" as to what damages, if any, Suhs sustained as a result of Gardon's alleged negligence, and the jury would therefore have been required to "guess."

10

¶22     To be sure, Suhs offered other evidence regarding damages, besides Brown's testimony.  Specifically, Suhs relied on the opinions of Michele Albers, a vocational rehabilitation counselor and life care planner, and Roger Feldman, an economist.  Albers testified as to Suhs' loss of earning capacity and as to a "life care plan" setting forth Suhs' future treatment expenses.  She conceded, however, that she relies on physicians to provide information about a patient's physical condition.  Albers further acknowledged that her conclusions were "based on [Suhs'] present problems" and that she had not considered what his condition would have been had the decompression surgery been performed earlier.  In other words, Albers merely assumed when performing her analysis that all of Suhs' permanent physical deficits were caused by Gardon's alleged negligence.  Feldman, for his part, simply testified as to the present value of the future treatment expenses and loss of earning capacity set forth in Albers' report.

¶23     Thus, neither Feldman nor Albers testified as to the critical question—namely, what, if any, harm Suhs sustained as a result of Gardon's alleged negligence in delaying Suhs' surgery.  Similarly, although Suhs testified regarding his pain and suffering and his daughter testified regarding her loss of society and companionship, they were not qualified to—and did not—testify as to the extent to which those damages were caused by Gardon's alleged negligence.

¶24     In support of his argument that he submitted sufficient evidence regarding causation and damages, Suhs relies on *Ehlinger*, a case involving omitted treatment.  The *Ehlinger* court held that, in such a case,

> the plaintiff need only show that the omitted treatment was intended to prevent the very type of harm which resulted, that the plaintiff would have submitted to the treatment, and that it is more probable than not the treatment *could* have lessened or avoided the plaintiff's injury had it been rendered.  It then is for the trier of fact to determine whether

11

> the defendant's negligence was a substantial factor in causing the plaintiff's harm.

*Ehlinger*, 155 Wis. 2d at 13-14.

¶25 Suhs' reliance on *Ehlinger* is misplaced. *Ehlinger* addressed the evidence a plaintiff must produce to establish causation and damages in a case involving omitted treatment. The instant case, however, does not involve omitted treatment. Gardon did not negligently misdiagnose Suhs' condition or fail to provide treatment for it. Instead, Suhs alleges that Gardon was negligent by waiting too long to perform the decompression surgery. Suhs does not cite any authority in support of the proposition that the standard set forth in *Ehlinger* applies to cases involving delayed, rather than omitted, treatment.

¶26 Moreover, even if we attempted to apply the standard set forth in *Ehlinger* in this case, we would still conclude that Suhs failed to submit sufficient evidence to survive Gardon's motion to dismiss. As noted above, *Ehlinger* requires a plaintiff to show "that it is more probable than not the treatment *could* have lessened or avoided the plaintiff's injury had it been rendered." *Id.* at 14. Again, in this case, Brown merely testified that Suhs' outcome would have been "better" had Gardon performed the decompression surgery on January 7. Brown did not offer any opinion as to how much better Suhs' symptoms would have been, nor did he opine that Suhs would not have had any permanent deficits if the surgery had been performed sooner. Furthermore, Brown conceded that patients with symptoms like Suhs' tend to have permanent deficits and that patients Brown had operated on within twenty-four hours of the onset of symptoms nevertheless suffered permanent injuries. On this record, Suhs did not establish that it was "more probable than not" that performing the decompression surgery on January 7 rather than January 8 could have lessened or avoided Suhs' injuries.

*By the Court.*—Order affirmed.

This opinion will not be published.  *See* WIS. STAT. RULE 809.23(1)(b)5.